RANDY FOLK, d/b/a Folk Blacktop Concrete Construction, Plaintiff and Counterdefendant-Appellee, v. CENTRAL NATIONAL BANK AND TRUST COMPANY OF ROCKFORD, n/k/a United Bank of Illinois, as Trustee, *et al.*, Defendants (Byron Dragway, Inc., Defendant and Counterplaintiff-Appellant).

Second District   No. 2—90—0025

Opinion filed November 8, 1990.—Modified on denial of rehearing March 7, 1991.

William P. Fearer II and Elizabeth A. Hegel, both of Fearer, Nye, Ahlberg & Chadwick, of Oregon, for appellant.

David A. Smith and Robert T. Hanson, both of Moehle, Smith & Nieman, P.C., of Oregon, for appellee Randy Folk.

Lisa A. Treviranus and Richard A. Palmer, both of Ward, Murray, Pace & Johnson, P.C., of Sterling, for appellee Oregon Stone, Inc.

JUSTICE WOODWARD delivered the opinion of the court:

Defendant, Byron Dragway, Inc., appeals from a judgment of the circuit court of Ogle County, wherein it found that plaintiff, Randy Folk, d/b/a Folk Blacktop Concrete Construction, had substantially performed its contract with defendant and, thus, ordered the enforcement of plaintiff's mechanic's lien. On appeal, defendant, Byron Dragway, raises two issues, namely, whether plaintiff substantially performed said contract and whether the trial court erred in considering its personal inspection of the subject dragway as part of the evidence.

Defendant is a corporation engaged in the auto dragway business in Byron, Illinois. Byron Dragway is the sole owner of the beneficial interest in the land trust holding title to the real estate upon which the subject dragway is located.

In 1986, defendant's insurance carrier informed defendant's president, Ronald L. Leek, that concrete retaining walls would be required at the dragway for insurance purposes. Because the surface of the dragway was 25 years old, defendant decided to resurface it and install electronic timing equipment, prior to the installation of the required concrete walls. Early in 1987, defendant secured financing for the improvements from United Bank of Southgate (Bank) and began soliciting bids for the proposed improvements at the dragway.

On or about July 10, 1987, plaintiff submitted to Mr. Leek a written proposal, which described the contemplated improvements to make certain improvements to the dragway described as follows:

"A. Saw cut out a 400' X 20' area in each lane, rip out and haul to South end of track.

B. Grade area's [sic] for 6" of concrete.

C. Install steel rebar the same as it was when we tore it out.

D. Pour six inches of concrete in each lane and finish.

PRICE: $24,250

Concrete Walls

A. Pour concrete walls as we discussed them for eleven dollars a foot. Anchoring them to old blacktop is open until I know for sure how you want it.

Blacktop Work

A. Fill all cracks and low spots so it is level.

B. Pave a 1½ hot mix matt in the area South of the staging lanes and 84' wide all the way down the track.

PRICE: $86,400

WE [sic] will fix bad spots while we are there with any leftover hot mix."

Thereafter, Leek orally accepted said proposal submitted to him by plaintiff. Plaintiff was to be paid upon completion of the construction.

Plaintiff then contracted with Oregon Stone, Inc. (asphalt), Beeline Ready-Mix (concrete), and Tom O'Day (concrete walls), each of whom supplied plaintiff with material services for use in the dragway's improvements.

Near completion of the construction, plaintiff submitted a modified proposal to Byron Dragway reflecting a discount for not applying primer to the old surface prior to the laying of the new surface and for paving less area than the contract required. Plaintiff also submitted an invoice for extra work and requested payment of said sums.

Thereupon, Leek spoke to the Bank concerning payment to plaintiff. The Bank refused to release funds to pay plaintiff due to the apparent defects in the asphalt and concrete surfaces. After several meetings and upon presentation of a letter from plaintiff stating that he would replace the concrete pad subsequent to the racing season, the Bank stated that it would release funds only if plaintiff would secure bonding and insurance. Plaintiff refused to provide evidence of bonding and insurance, and as a result, the Bank refused to release

funds to pay for the new construction due to the dragway's defective condition.

On October 8, 1987, plaintiff filed a complaint for foreclosure of mechanic's lien against the dragway, subcontractors Oregon Stone, Inc., Beeline Ready-Mix, Tom O'Day, and the Bank. In response thereto, on April 25, 1988, defendant filed its answer and counterclaim against plaintiff for breach of contract as a result of plaintiff's failure to perform the terms of the contract in a workmanlike manner. The subcontractors, Oregon Stone, Inc., Beeline Ready-Mix, and Tom O'Day, filed answers and cross-complaints for foreclosure of mechanic's lien for materials and services provided in the new construction. The Bank also filed an answer and cross-claim for foreclosure.

A bench trial was held April 11, 1989, through April 14, 1989. At the conclusion of the parties' cases in chief, the trial judge personally inspected the disputed improvements at the dragway. On June 2, 1989, the trial court issued a memorandum decision stating that plaintiff had substantially performed the terms of its contract with defendant. On August 18, 1989, the trial court entered a judgment of foreclosure and sale in favor of plaintiff and the subcontractors and against defendant in the amount of $140,272.48 plus interest. The judgment amount included a credit of $25,120 for plaintiff's failure to apply primer and to pave properly certain areas as specified by the contract.

On September 13, 1989, defendant filed its motion after judgment which was denied by the trial court on December 13, 1989. This appeal followed.

We initially address the issue of whether the court below erred in finding that plaintiff substantially complied with the contract and, therefore, found that its mechanic's lien should be enforced.

■■■ As a general rule, although a mechanic's lien claimant must show performance of the contract as a prerequisite to enforcement of the lien, substantial performance of the contract made in good faith will generally entitle the contractor to maintain his suit to enforce his lien. (*Ruddy v. McDonald* (1910), 244 Ill. 494, 499.) A contractor must prove that there was an honest and faithful performance of the contract in its material and substantial parts, with no willful departure from, or omission of, the essential elements of the contract. (*Delta Construction, Inc. v. Dressler* (1978), 64 Ill. App. 3d 867.) A contractor is not required to perform perfectly, but rather is held only to the duty of substantial performance in a workmanlike manner. (*Watson Lumber Co. v. Guennewig* (1967), 79 Ill. App. 2d 377, 397.) What constitutes substantial performance is difficult to define, and whether

substantial performance has been given will depend upon the relevant facts of each case. (*Brewer v. Custom Builders Corp.* (1976), 42 Ill. App. 3d 668.) However, the burden is on the contractor to prove the elements of substantial performance in order to enforce his lien. (*Watson Lumber Co.*, 79 Ill. App. 2d at 397.) A contractor whose performance amounts to less than substantial performance is not entitled to the contract price. If there is not substantial performance, then the contractor can recover, under a theory of *quantum meruit*, only the reasonable value received by the purchaser and above the injury suffered by the builder's breach. (*George Butkovich & Sons, Inc. v. State Bank* (1978), 62 Ill. App. 3d 810, 811.) On appeal, the issue of whether there has been substantial performance is a question of fact, and the trial court's resolution of this question will not be disturbed unless it is against the manifest weight of the evidence. *W.E. Erickson Construction, Inc. v. Congress-Kenilworth Corp.* (1986), 115 Ill. 2d 119, 127.

Defendant argues that the evidence demonstrates that plaintiff did not substantially perform the contract.

Plaintiff testified that Ronald Leek, president of the defendant corporation, approached him to bid on the subject repairs of the dragway's quarter-mile track. Plaintiff had previously done repair work at the raceway. Leek wanted a written estimate from plaintiff to present to the Bank. Nothing in the final agreement indicated that plaintiff would apply a primer to the old surface before installing the new surface. There were no engineer's specifications for the job because Leek stated it would cost too much to procure them.

Plaintiff tore out the old concrete starting pads, which were approximately 250 feet in length. Plaintiff told Leek that the weather was too hot to pour the new concrete pads (which were to be 400 feet in length), but Leek insisted they be put in before the United Drag Racers Association (UDRA) meet on August 4, 1987. Plaintiff put in a 1½-inch asphalt layer at the juncture where the concrete starting pads ended and the asphalt began. Plaintiff did not have time to lay the entire asphalt surface prior to the UDRA meet on August 4, 1987.

Plaintiff admitted the concrete pads were not in good shape for the UDRA event because of the lack of adequate traction on the starting pads. Plaintiff stated that it normally took three to six weeks for the new starting pads to reach an acceptable level of traction, depending on the amount of traffic on the surface.

After the UDRA race, plaintiff installed a layer of asphalt on the remainder of the track. Plaintiff, a racer himself, competed in a num-

ber of Byron meets held in the fall of 1987. He admitted that there was a noticeable dip in the track's left lane. He offered to repair the dip for free, provided that the dragway pay at least something of what it owed.

On cross-examination, plaintiff stated that indentations in the new track where rainwater accumulated were not unusual and could easily be dried with proper equipment. Plaintiff admitted that there were dips both in the concrete pads and in the asphalt surface. Conversely, he stated that the irregular seams in the asphalt surface did not present drivers with any problems. Plaintiff maintained that Leek knew that a 1-inch rather than a 1½-inch layer of asphalt would actually be applied. On his estimate, plaintiff quoted a price for a 1½-inch layer of asphalt, so that the Bank would be more amenable to making the loan for repairs. Plaintiff's paving machines were not equipped with electronic instruments to assure a uniform layer of pavement. Plaintiff conceded that the dragway was the only one that he had ever paved.

James Gastel, a consulting engineer, testified on plaintiff's behalf. Plaintiff contacted Gastel in March 1988 to inspect and perform tests upon the raceway. Gastel generally inspected the track in March 1988, observing its condition but taking no measurements. He then reviewed the reports of the defendant's expert and examined core samples taken from the track by Testing Engineers. He found no problems arising from the irregular seams in the asphalt; nor did he find that there was a lack of bonding between the old and new surfaces. Gastel opined that the asphalt work was in accordance with general procedures and that the asphalt work appeared adequate.

Gastel stated that it was generally accepted that primer be applied to secure a better bond between layers of asphalt pavement. Also, he found that the east concrete pad required substantial repairs totaling approximately $23,000.

On cross-examination, Gastel testified that he would recommend the use of a primer, but that if the agreement did not call for primer, then plaintiff had no obligation to apply it. Gastel admitted that the agreement called for a 1½-inch layer of asphalt the entire length of the track. A 1½-inch layer would last longer than a 1-inch surface. Gastel further admitted that he did not wedge a shovel between the layers to determine bonding between the layers.

Bill Porter, a road contractor who specializes in the laying of "hot mix" surfaces, testified for plaintiff. Porter inspected Byron's new surface, which he found to be "nice and tight." Porter often did not use primer; he thought that a good bond could be obtained if the old

surface was heated. Porter unsuccessfully attempted to wedge a pointed bar between the layers, indicating a good bond between them.

Plaintiff put on several race car drivers who testified that they had raced on the new surface in late summer and fall of 1987. They found that surface to be acceptable and as good as or better than other tracks. One driver, Mike Bonebright, stated that the surface was "not good" for the UDRA event in early August 1987, but that surface, with the exception of the dip in the left-hand lane, continued to improve throughout the remainder of the 1987 racing season.

Ronald Leek testified that he was president of the defendant corporation. The old asphalt surface had been installed in 1965. In 1981, Byron's starting area or pad was changed from asphalt to a 250-foot concrete surface. The new concrete pad installed in 1987 by plaintiff measured 400 feet in length.

Defendant's insurer required improvements to the track's concrete retaining walls, which protected spectators from accidental injuries. Because defendant had to make improvements on the retaining wall, defendant's officers decided to make other repairs, including the resurfacing of the raceway.

Leek negotiated the subject agreement with plaintiff. During negotiations over the subject agreement, plaintiff told Leek that it was important to apply primer to the old surface to improve the bond with the new surface. Further, Leek intended the asphalt surface to be 1½ inches thick. He did not agree to a 1-inch asphalt layer. Plaintiff sought this job rather than defendant soliciting him to bid on the project.

As the asphalt was being put down, Leek noticed that plaintiff was not applying a primer to the old surface. He confronted plaintiff about this; plaintiff stated that he had talked about primer with other contractors and decided it was not necessary to apply it. Leek relied on plaintiff's judgment.

The concrete starting pads were completed immediately prior to the UDRA meet on August 4, 1987. These pads provided so little traction for the vehicles that the UDRA officials, attending the event, decided that it was unsafe to run the cars at full speed. Following the UDRA meet, the new blacktop surface was applied. Approximately 18 local meets were held at Byron in late summer and fall 1987. Leek concluded that, after this number of events, the concrete pads were "never ever going to be right" because they could not provide sufficient traction for the vehicles. Eventually, the UDRA informed Leek that it would not hold further meets at Byron due to the track's condition.

The track's condition continued to deteriorate, with the concrete pads and the asphalt track having a washboard-like surface. Further, Leek opined that there was no bonding between the old and new asphalt layers. On one occasion, he had wedged a shovel between the layers and found he could push it ahead as far as he wanted to. Moreover, the new surface did not drain properly, causing him to cancel several racing dates. The old surface had drained perfectly.

On cross-examination, Leek stated that in fall 1987 there were three accidents in which vehicles crashed into the retaining walls. Leek termed this very unusual, as in the prior months of racing during 1987 only one accident had occurred. Leek admitted that priming was not part of the proposal. He discovered the fact that the new asphalt surface's thickness was 1 inch rather than 1½ inches only after the track was three-fourths completed. After the Bank determined that there were problems with the work completed, it requested that plaintiff be bonded and insured. Plaintiff told Leek that he would tear out all the concrete and replace it. There was no written agreement verifying such a promise by plaintiff.

Roger Gustafson and Patricia Leek, Leek's brother-in-law and wife, respectively, testified that they were present at conversations between plaintiff and Leek in which plaintiff said he would apply primer to the old surface.

Daniel Frankfother, a licensed professional engineer, who was vice-president and head of the road and street department at Willett, Hofmann & Associates, Inc., conducted extensive engineering field tests on the racing surface constructed by plaintiff. Frankfother performed a straight-edged test on both the concrete and blacktop surfaces at the dragway and noted extreme and continuous surface variations throughout *both* the concrete pads and the entire blacktop overlay. Frankfother stated that the deviations on both the concrete and blacktop surfaces far exceeded the standard specifications for construction of Illinois highways which contemplate traffic at speeds up to 70 miles per hour. Willett & Hofmann applies the State standard specifications on *all* its construction projects (private or public) and considers the standards to be reflective of general industry practice. Frankfother testified that this type of continuous surface variation causes cars traveling 70 miles per hour to experience a harmonic washboard effect. He opined that the effect of the continuous surface variation on cars traveling in speeds in excess of 70 miles per hour, as was the rule at the dragway, would be even more pronounced.

Further, Frankfother noted that the seams of the blacktop overlay were very uneven. This unevenness, he testified, would cause cars to

follow the seams with their tires resulting in a loss of control. In view of these defects, Frankfother stated that the surface was not safe for traffic traveling at speeds up to only 70 miles per hour. In his opinion, the defects were so severe as to require *total replacement of both of the concrete pads and the entire blacktop surface*.

John Berg testified that he was an estimator for Rockford Blacktop, which had also submitted a bid on the subject project. Berg's estimate was based on scraping the old surface to promote a better bond, the application of primer between the old layer and new layer, and the laying of a 1½-inch asphalt surface over the majority of the track. Rockford Blacktop made no bid for the paving of the concrete pads. At the time he made the estimate, Berg found the condition of the old surface to be "pretty good."

At the request of defendant, Berg inspected the track's new surface early in November 1987. Berg found the seams in the asphalt pavement were not straight for the length of the track. Berg found the workmanship on the new pavement to be of poor quality and stated that to repair the track, it would be necessary to grind off the asphalt put in by plaintiff, repair the underlying track, prime the surface, and put down a new layer of pavement. On cross-examination, Berg admitted that he did not perform any tests upon the track.

Ronald Colson, publisher of a car racing newspaper and an experienced race car driver, testified that he had competed numerous times at Byron Dragway. He was also secretary of the UDRA and on the board of directors. Because of the bad condition of the track, the UDRA, which had scheduled a day of racing on August 4, 1987, had to downgrade said event from a competition to an exhibition, with the drivers putting on "a show for the crowd." The concrete starting pads were too smooth to provide traction necessary to the vehicles. Further, the dips in the concrete pads could cause racers to abort their runs or, in the extreme cases, run into the guardrail.

Colson returned to the racetrack in September and October 1987 to determine if the UDRA would hold further meets at Byron. He noticed that the seam lines in the asphalt were wavy and that rain collected in puddles in the track. Colson found that the UDRA needed a more textured starting pad and a smoother asphalt surface. On behalf of the UDRA, Colson wrote defendant early in 1988, stating that due to concerns about the safety of the track, the association would not sponsor further meets at Byron.

Duane Nichols, president of the UDRA, testified that the association is the largest owners and drivers association in the nation. It sponsors racing events throughout the country, featuring pro stock

cars, super-charged funny cars, dragsters, and exhibition cars, which travel between 180 and 260 miles per hour. Inspecting the new track in fall 1987, Nichols observed that the new concrete pads were extremely smooth, plus there were significant dips in the concrete surface. Nichols particularly noted a dip where the concrete met the asphalt, an imperfection which would cause cars' tires to spin sideways. He observed several puddles in both asphalt lanes, where the surface dipped.

Also, in fall 1987, Nichols attended a local meet held at Byron. Cars were having problems getting down the track, and several of them lost control, with one crashing. Nichols stated that no future UDRA events should be held at the track until the surface was repaired.

On cross-examination, Nichols stated that Leek had never said that he would not reopen the track and that Leek did not solicit the letter from UDRA, which informed defendant that it would not sponsor future events at the dragway until the surface was repaired.

A report from Testing Engineers, Inc., was admitted into evidence. Testing Engineers cut 21 core samples from various points in the new surface. These samples indicated that the asphalt surfaces' thickness varied from thirteen-sixteenths inch to $2\frac{1}{8}$ inches, with the average thickness of the core samples being somewhat less than $1\frac{1}{4}$ inches.

Russell Carlson, who performed the electrical work at the dragway, testified that plaintiff was working with "not very good" equipment. Moreover, on several occasions, plaintiff's workers caused delays in the progress of Carlson's crew, adding to the cost of installing the electrical equipment by approximately $8,800. On cross-examination, Carlson conceded that Leek had not paid the additional amount.

Two race drivers, John Reikes and John Cannon, testified as to their experiences on the new track. Reikes raced on both the old and new surfaces. Reikes said the old surface was one of the best he had been on, and the new surface was one of the worst. Reikes stated that the west lane concrete pad dipped significantly, causing him to lose control of his car. As a spectator, Reikes noticed that racers were having trouble controlling their cars in both lanes.

John Cannon, who had raced since 1960, raced his car at Byron in 1986 and 1987. He found the old surface as good as or better than the surface of the other three tracks on which he competed. Cannon raced at the August 4, 1987, meet sponsored by the UDRA. He raced on both lanes and found that each concrete pad was "wavy." The concrete's condition caused him to stop several runs. The asphalt section

was "fairly smooth" except for the dips at the end of the track. Despite these problems, Cannon went back to Byron in the fall, primarily because he was used to going to the dragway track. Cannon stated that he would not have returned to Byron in 1988 if repairs had not been made to the new surface.

Ronald Leek testified on surrebuttal that all repairs were intended to improve the facility. He wanted Byron to be a safe track for many years to come. He also planned to tear down the old stands, replacing them with new ones.

At the trial's end, the trial judge personally inspected the dragway in the presence of the parties and their respective counsel. In its memorandum decision, the trial court wrote in relevant part:

"I have examined all of the evidence, the exhibits, and personally examined the track, and it's my opinion that the plaintiff substantially performed his contract and should be awarded the judgment against the defendant in the amount of $119,076.00, less the amount of money necessary to replace the 100 feet of concrete on the east starting line, and the allowance for not using any primer, which would give the defendant a credit of $25,120.00, for a net to the plaintiff of $93,956.00. I do this based upon the testimony, as well as my own examination. My examination showed that for the most part, the asphalt surface was fairly smooth, with the exception that if you assume that the passes start at the east side, and number that number one, and go to the far west side, which would be pass [*sic*] number eight, that the seams between pass number two and three and seven and eight are rough. I checked for separation by observing the outer seams and all of the test holes, and the holes made by the cement contractor for the re-rod for the retaining walls on each side of the track, and I did not find any separation in any hole. I did see two places, one on the east and one on the west edge where there was a separation in for about four or five inches. All of the passes after the turn-off lanes are rough, but there was some testimony that the plaintiff didn't realize that he was going to have to do those lanes until he had commenced work. I would have allowed some credit for that area, except that there's no testimony in regards to how much that cost to do that area beyond the turn-off lanes."

Besides awarding plaintiff $93,956, the court below also found for Oregon Stone, Beeline, and Tom O'Day in the amounts of $46,402.89, $11,222.14, and $22,750, respectively. Further, the court found that

the first lien was to the Bank in the amount of $29,325, plus accrued interest.

Defendant relies primarily on two cases, *George Butkovich & Sons, Inc. v. State Bank* (1978), 62 Ill. App. 3d 810, and *Levan v. Richter* (1987), 152 Ill. App. 3d 1082, to support its contentions. In *Butkovich*, the contractor brought an action to foreclose its mechanic's lien for work performed on the purchaser's home. The purchaser alleged several omissions from the contract, namely, that the contractor had failed to install water stops to prevent leaking, failed to install wire mesh for reinforcement in the basement floor, failed to recess glass blocks, and failed to install underground garbage cans in the residence. The purchaser also alleged poor quality of workmanship in that the residence was constructed at the floor elevation nearly 10 inches below the level required and that there were cold joints and honeycombs in the concrete work performed by the contractor.

Noting that a contractor is held to the duty of substantial performance in a workmanlike manner and that the substantial performance is dependent upon the relevant facts of each case, the *Butkovich* court concluded that, in view of the omissions from the contract and the evidence of poor workmanship, the contractor had not substantially performed his contract and could, therefore, not enforce his lien. The court reasoned that although the water stops were not mentioned in the contract, the parties had lengthy discussions on potential water problems. The water stops and wire mesh were required by specifications which the contractor admitted were a necessary part of the contract.

*Levan v. Richter* (1987), 152 Ill. App. 3d 1082, involved a determination as to substantial performance in view of several omissions from the terms of the contract. In *Levan*, the purchasers brought a breach of contract action against a distributor and contractor for construction of a swimming pool. The purchasers alleged that the contractor had failed to complete the pool in accordance with the contract's specifications and that the pool was rendered unusable due to its negligent installation. Upon completion, the pool was filled with water, and over the course of only two days, the water level in the pool dropped one foot. After the pool had been drained, it became apparent that the contractor had failed to follow several contract specifications. The floor of the pool was 3 to 4 inches thick instead of the required 6- to 8-inch thickness, and the wire mesh reinforcements and steel rods required by the contract were not installed. The parties acknowledged that the pool could not be repaired. The *Levan* court found that the contractor had failed to follow the contract in several

material aspects and that, as a result of such failure, the pool had suffered a catastrophic, irreparable break the first night it was filled with water. The court held that the purchasers were entitled to expect that a swimming pool would hold water and that the pool's failure to hold water constituted a breach of contract.

We find the instant facts are most similar to those adduced in *Butkovich,* wherein the omissions from the contract, plus the evidence of poor quality workmanship, caused this court to find that the contractor had not substantially performed its contract with defendant. Here, the evidence demonstrated that plaintiff failed to apply the agreed upon 1½-inch layer of asphalt. Indeed, the core samples indicate that plaintiff installed a very uneven layer of asphalt. This unevenness is corroborated by the testimony of defendant's expert, Daniel Frankfother, who found that drivers on such a surface would experience a washboard effect. Plaintiff's own expert indicated that the thinner surface would not last as long as the agreed upon 1½-inch layer. Plaintiff's argument that the parties did not intend to lay a 1½-inch layer of asphalt is belied by the agreement's language and Leek's testimony to the contrary.

As to plaintiff's workmanship, the evidence points convincingly to its poor quality. Frankfother stated the defects of both the concrete starting pads and the asphalt surface were so severe that the total replacement of both was necessary. John Berg of Rockford Blacktop thought that the new asphalt surface would have to be ground off prior to the installation of a new surface. Ronald Colson and Duane Nichols, of the UDRA, found that both the concrete pads and asphalt track were unsafe, and the UDRA board refused to sponsor any future events until the new surface was thoroughly repaired.

We find this evidence much more persuasive than that put forward by plaintiff. The resume of plaintiff's expert, James Gastel, indicates little direct experience with road construction and a great deal of experience in agricultural engineering, which is hardly germane to this case. Moreover, Gastel's analysis and observation of the subject dragway was less extensive and detailed than that of Frankfother. Gastel admitted that his field tests of the track were limited to the east concrete starting pad, which he found defective.

■■ Therefore, the trial court's judgment of August 13, 1989, ordering foreclosure and sale is reversed except as to the judgment in favor of the counterplaintiff, Oregon Stone, Inc., against the counterdefendant, Randy Folk, d/b/a Folk Blacktop Concrete Construction, in the sum of $46,402.89, plus costs and interest for the reason that the

amount thereof was stipulated and said judgment was not attacked in this appeal.

Further, this cause is remanded to the trial court for further proceedings pursuant to section 21 of the Mechanics' Liens Act (Ill. Rev. Stat. 1987, ch. 82, par. 21) as follows:

(1) to determine the reasonable value of services rendered and materials furnished to the defendant, Byron Dragways, Inc., by the plaintiff, Randy Folk, d/b/a Folk Blacktop Concrete Construction, Inc.;

(2) to determine the subcontractors, with the exception of Oregon Stone, Inc., who properly preserved their respective rights to a mechanic's lien and the reasonable value of the services rendered and materials furnished to Byron Dragways, Inc.; and

(3) that the total amount of the mechanic's lien rights of the plaintiff and his subcontractors, including the sum due Oregon Stone, Inc., shall not exceed the sum due to the plaintiff, Randy Folk, d/b/a Folk Blacktop Concrete Construction, Inc., and if said sum exceeds the amount due the plaintiff, then the respective mechanic's lien against Byron Dragway, Inc.'s, property shall be proportionately reduced and prorated.

Reversed in part; remanded with directions.

McLAREN and GEIGER, JJ., concur.