CONTRACT DEVELOPMENT CORPORATION, Plaintiff and Counter-defendant-Appellant and Cross-Appellee, v. STANLEY BECK *et al.*, d/b/a Star Development Company, Defendants and Counterplaintiffs-Appellees and Cross-Appellants.

Second District   No. 2—93—0358

Opinion filed January 27, 1994.—Rehearing denied February 25, 1994.

Sabo & Zahn, of Chicago (Werner Sabo, of counsel), for appellant.

Victor P. Henderson, of Pope & John, Ltd., of Chicago (Dean A. Dickie, of counsel), for appellees.

JUSTICE McLAREN delivered the opinion of the court:

The counterdefendant and cross-appellee, Contract Development Corp. (CDC), appeals from an order entering judgment in favor of Stanley Beck and Charlotte Beck (the Becks), doing business as Star Development Co., counterplaintiffs and cross-appellants, on the Becks' counterclaim for slander of title. CDC's notice of appeal also states that it appeals from the denial of its motion for summary judgment. The Becks filed a cross-appeal seeking additional attorney fees on their counterclaim for slander of title and contesting the date from which interest was set to accrue on the judgment. For the following reasons, we reverse and remand.

On July 18, 1988, CDC entered into a contract with the Becks to provide services as construction manager on property belonging to the Becks. In addition to the general services as construction manager listed in the form contract, CDC agreed to provide the following services:

"1. Coordination of Project Architect and Engineer.

2. Take responsibility for necessary zoning variances with the City of Libertyville, County of Lake, I.D.O.T. and other governing bodies with jurisdiction.

3. Preparation of financial *proformas* for bank financing, and presentation of same with Owner to lending institutions.

4. Preparation and implementation of marketing and leasing plan, and negotiation of store leases on behalf of Owner."

The Becks became dissatisfied with CDC's performance, or lack thereof, and refused to pay CDC for the work it performed. CDC filed two liens against the property under the Mechanics Lien Act (770 ILCS 60/1 *et seq.* (West 1992)). CDC subsequently filed a complaint against the Becks in three counts. Count I requested the foreclosure of the mechanic's liens. Count II was based on breach of contract. Count III sought relief for *quantum meruit.*

The Becks responded by filing a motion to dismiss CDC's complaint pursuant to section 2—619 of the Code of Civil Procedure. (735 ILCS 5/2—619(a)(9) (West 1992).) The motion was denied and further proceedings were stayed pending arbitration, as the contract between the parties specified that disputes would be settled by arbitration. After a hearing, the arbitrator awarded damages in favor of CDC for $58,851. The trial court confirmed this award by entering a judgment on April 9, 1990.

On May 16, 1990, the trial court granted the Becks' motion for leave to file a counterclaim against CDC for slander of title. CDC responded by filing a motion to strike and dismiss the counterclaim. On June 20, 1990, the trial court granted CDC leave to withdraw its mechanic's lien claims and withdrew its previous order granting the Becks leave to file the counterclaim. The court dismissed the Becks' counterclaim for slander of title "without prejudice to refile as a separate action" and concluded that all matters in controversy were disposed of.

The Becks appealed the order which dismissed their counterclaim. In *Contract Development Corp. v. Beck* (1991), 210 Ill. App. 3d 677, we reinstated the Becks' counterclaim for slander of title on the basis that CDC should not have been allowed to voluntarily withdraw its complaint when a counterclaim was pending and subsequently move to dismiss the counterclaim. The case was remanded to the trial court upon the filing of the opinion.

In accord with our opinion, the Becks filed three amended counterclaims alleging slander of title and fraud. The Becks asserted that on February 1, 1989, and on February 15, 1989, CDC recorded liens under the Mechanics Lien Act against the subject property *knowing*

that the services performed were nonlienable. CDC filed a motion for summary judgment on the basis that the Becks could not recover for slander of title because they did not hold title to the property at the time they filed the counterclaim, as they had conveyed title to Star Development Company, their wholly owned corporation, by quitclaim deed prior to filing the counterclaim. Attached to the motion were an affidavit by Carl Bryant, owner of CDC, and certified copies of documents which showed that the Becks were not in title to the property at the time the counterclaim was filed. After a hearing, the court denied CDC's motion for summary judgment. Thereafter, the Becks moved to add Star Development Company, the present owner of the property, as a party plaintiff. The motion was denied.

The Becks' counterclaim for slander of title and fraud proceeded to a bench trial. The Becks asserted that CDC maliciously filed the mechanic's liens against the property knowing that the services performed were nonlienable and refused to remove the liens upon demand. The trial court found in favor of the Becks on the slander of title claim and awarded damages totalling $18,737.76. The court found in favor of CDC on the fraud claim. On April 15, 1992, a written judgment order was entered which stated that "judgment of the trial of this matter is hereby entered, *except for*, calculation of interest amounts in connection with offsetting judgments (*i.e.* arbitration award versus trial court award)." (Emphasis in original.)

The Becks filed a post-trial motion to modify the judgment which requested additional attorney fees for services rendered by the law firms of Laidley & Sutter ($3,832.75) and Pope & John (in excess of $60,000). In an order entered on June 18, 1992, the court denied the Becks' motion and ordered that judgment interest shall run from April 15, 1992. CDC filed a motion to clarify the order because it failed to specify whether interest was assessed on the judgment which confirmed the arbitrator's award. The court responded by ordering that interest would not accrue on orders or awards entered prior to April 15, 1992. CDC filed an appeal, and the Becks filed a cross-appeal. The appeal and cross-appeal were dismissed by the appellate court for lack of a final and appealable order.

On March 23, 1993, the trial court entered a final judgment on the Becks' counterclaim. The court found in favor of the Becks on the slander of title count and in favor of CDC on the fraud count. Damages were awarded to the Becks totalling $18,737.76. The order reflected that the judgment encompassed $2,000 for attorney fees to Laidley & Sutter, $1,800 for the cost of the letter of credit, and $14,937.76 for interest due on loans in connection with the project.

The court finalized the judgment by setting off the judgment on the slander of title portion of the counterclaim against the judgment of $56,851 in favor of CDC which confirmed the arbitrator's award. A net amount of $38,113.24 was due from the Becks to CDC. Interest on the judgment was set to accrue as of April 15, 1992, the date it was initially entered.

CDC appealed on the basis that the judgment in favor of the Becks was against the manifest weight of the evidence. The Becks filed a cross-appeal requesting additional attorney fees on their counterclaim for slander of title and contesting the date from which interest was set to accrue on the judgment.

CDC's first contention on appeal is that the court erred in denying its motion for summary judgment. CDC urges that a cause of action for slander of title may only be maintained by a party with interest in the property. Since the Becks conveyed title to the subject property by quitclaim deed to Star Development Company, their wholly owned corporation, prior to filing the counterclaim for slander of title, CDC contends that there is no genuine issue of fact concerning the Becks' right to relief on the theory of slander of title.

█ A prior order denying a motion for summary judgment is not reviewable after an evidentiary trial, as any error in the denial is merged in the subsequent trial. (*Lambert v. City of Lake Forest* (1989), 186 Ill. App. 3d 937, 940; *Newkirk v. Bigard* (1984), 125 Ill. App. 3d 454, 459, *aff'd in part & rev'd in part on other grounds* (1985), 109 Ill. 2d 28.) Consequently, we need not review the trial court's order denying summary judgment on the slander of title count of the Becks' counterclaim.

CDC raised the issue of the Becks' transfer of title in support of its motion for summary judgment and in support of its motion for judgment at the close of the Becks' case in chief. Both motions were denied and are not reviewable on appeal, since CDC proceeded to introduce evidence in support of its defense. CDC did not assert that the Becks lacked standing to assert a claim of slander of title as an affirmative defense. Although standing is a component of justiciability (*In re Marriage of Rodriguez* (1989), 131 Ill. 2d 273, 280), it is not jurisdictional. Rather, the lack of standing is an affirmative defense. (*Noyola v. Board of Education* (1992), 227 Ill. App. 3d 429, 432.) Questions not raised in the trial court are deemed waived and cannot be argued for the first time on appeal. (*Rodriguez*, 131 Ill. 2d at 279.) Since CDC failed to plead the lack of standing as an affirmative defense, we deem this issue waived.

■ Next, CDC contends that judgment in favor of the Becks on the slander of title count is against the manifest weight of the evidence because the Becks failed to sustain their burden of proof. The Restatement (Second) of Torts section 623A explains the liability for publication of injurious false statements as follows:

"One who publishes a false statement harmful to the interests of another is subject to liability for pecuniary loss resulting to the other if

(a) he intends for publication of the statement to result in harm to interests of the other having a pecuniary value, or either recognizes or should recognize that it is likely to do so, and

(b) he knows that the statement is false or acts in reckless disregard of its truth or falsity." (Restatement (Second) of Torts §623A (1977).)

Illinois courts have utilized this definition in specifying the elements necessary to prove a *prima facie* case of slander of title. (*Whildin v. Kovacs* (1980), 82 Ill. App. 3d 1015, 1017; see also *Midwest Glass Co. v. Stanford Development Co.* (1975), 34 Ill. App. 3d 130, 133-34.) It has been held that the party asserting slander of title bears the burden of proving (1) a false and malicious publication, either oral or written, (2) of words which disparage a person's title to property, and (3) result in special damages. *Suhadolnik v. City of Springfield* (1989), 184 Ill. App. 3d 155, 184; *Newkirk*, 125 Ill. App. 3d at 462.

CDC contends that the Becks failed to prove that it acted with actual malice by recording the mechanic's liens. The act of maliciously recording a document which clouds another's title to real estate is actionable as slander of title. (*Whildin*, 82 Ill. App. 3d at 1016.) Although Illinois courts have held that implied malice is sufficient to establish a *prima facie* case of slander of title (*Home Investments Fund v. Robertson* (1973), 10 Ill. App. 3d 840, 842), more recent cases have required a showing of actual malice. (*Pecora v. Szabo* (1981), 94 Ill. App. 3d 57, 66.) This standard requires knowledge by the defendants that the disparaging statements were false or were made with reckless disregard of their truth or falsity. (*Pecora*, 94 Ill. App. 3d at 66.) Reckless disregard concerning the truth or falsity of a matter has been defined in Illinois as publishing the allegedly damaging matter " 'despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth.' " *Kuwik v. Starmark Star Marketing & Administration, Inc.* (1993), 156 Ill. 2d 16, 24-25, quoting *Mittelman v. Witous* (1989), 135 Ill. 2d 220, 237-38.

Under this standard, the Becks were required to show that CDC recorded the mechanic's liens despite a high degree of awareness that the activities performed were nonlienable. The Becks suggest that they sustained their burden of proving actual malice since the services upon which the liens were based were not lienable under the Mechanics Lien Act.

The basis for filing a lien under the Mechanics Lien Act is the performance of work or the furnishing of materials which constitute an improvement to the land. (*Cleveland Wrecking Co. v. Central National Bank* (1991), 216 Ill. App. 3d 279, 285.) Section 1 of the Mechanics Lien Act specifies the situations in which a lien may be filed:

> "Any person who shall by any contract or contracts, express or implied *** with the owner of a lot or tract of land, *** to improve the lot or tract of land or to manage a structure thereon, *** or perform any services or incur any expense as an architect, structural engineer, professional engineer, land surveyor or property manager in, for or on a lot or tract of land for any such purpose *** is known under this Act as a contractor, and has a lien upon the whole of such lot or tract of land *** for the amount due to him for such *** services or labor, and interest at the rate of 10% per annum from the date the same is due." (770 ILCS 60/1 (West 1992).)

To determine the validity of a claim under the Act, the focus of the inquiry is whether the work performed has enhanced the value of the land. (*Cleveland Wrecking*, 216 Ill. App. 3d at 285; *Watson v. Watson* (1991), 218 Ill. App. 3d 397, 400.) While complete performance under a contract is normally a prerequisite to filing a lien under the Act, a valid excuse for nonperformance, such as the anticipatory breach of contract by the owner, entitles the contractor to enforce his lien for the value of the work that has been completed. *Crowen v. Meyer* (1930), 342 Ill. 46, 51; *Wilmette Partners v. Hamel* (1992), 230 Ill. App. 3d 248, 261; *Folk v. Central National Bank & Trust Co.* (1990), 210 Ill. App. 3d 43, 46; *Brady Brick & Supply Co. v. Lotito* (1976), 43 Ill. App. 3d 69, 73-74.

Under the Act, architects, structural engineers, professional engineers, land surveyors and property managers who perform any service or incur any expense for any purpose are entitled to a lien. (770 ILCS 60/1 (West 1992).) However, applicable case law does not specify under what circumstances these professionals are entitled to a lien. In *Freeman v. Rinaker* (1900), 185 Ill. 172, an architect prepared plans and specifications in connection with the construction of a hotel. The contract between the parties specified that the architect would be

paid 2½% of the construction costs, payable as the work progressed. When the owner abandoned the project and construction never commenced, the architect filed a mechanic's lien against the property. Although the court noted in *dicta* that the architect would undoubtedly be entitled to recover for his services in an action at law, it held that the architect's contract provided an insufficient basis for a mechanic's lien, since the architect's payment was based on actual construction costs and the contract failed to provide a date that construction would be completed or that final payment would be rendered. See also *Ohrenstein v. Howell* (1922), 227 Ill. App. 215; *Richardson v. Central Lumber Co.* (1904), 112 Ill. App. 160.

Contrary to *Freeman*, the architect in *Crowen v. Meyer* (1930), 342 Ill. 46, 52, was entitled to enforce a mechanic's lien for the value of work performed even though the owner abandoned the project and there was never an improvement on the land. The *Crowen* court quoted from *dicta* in *Freeman v. Rinaker*, which reasoned that architects were entitled to a lien without an improvement on the property because the language of the Act specifically included architects as a class of persons who may enforce a lien for services rendered. *Crowen*, 342 Ill. at 51-52, citing *Freeman*, 185 Ill. at 176; see also *Mallinger v. Shapiro* (1928), 329 Ill. 629; *In re California Steel Co.* (N.D. Ill. 1982), 21 Bankr. 383.

One court recently departed from the *Crowen* rationale by holding that the services performed must constitute an improvement to the land or the lien claim is not valid. In *Watson v. Watson* (1991), 218 Ill. App. 3d 397, the plaintiff filed a complaint to foreclose a mechanic's lien for services performed as property manager on unimproved farmland. At the time the lien was filed, the plaintiff made payments and advances for Federal estate tax installments, county real estate taxes, and farm operating loans. The appellate court affirmed the dismissal of the plaintiff's complaint on the basis that the payment of taxes was nonlienable because it did not enhance the value of the farmland. The court attributed no merit to the plaintiff's suggestion that the value of the land would have decreased if the taxes were not paid and liens were attached. The court reasoned that the sale of real estate subject to a tax lien would not diminish the value of the property. Rather, a credit for the unpaid taxes would be deducted at closing from the final sale price. On this basis, the *Watson* court concluded that the "[m]ere preservation and maintenance of value does not reach the level of enhancement required by the Act and, therefore, does not support the imposition of a lien." *Watson*, 218 Ill. App. 3d at 400; see also *Cleveland Wrecking*, 216 Ill. App. 3d at 286-87.

Our courts have embraced the rationale of *Freeman* by holding that the total amount due under the contract must be apportionable between lienable and nonlienable items or the entire lien claim will fail. (*Cleveland Wrecking*, 216 Ill. App. 3d at 287; *B R L Carpenters, Ltd. v. American National Bank & Trust Co.* (1984), 126 Ill. App. 3d 137, 142; *Verplank Concrete & Supply, Inc. v. Marsh* (1976), 40 Ill. App. 3d 742, 744.) In *B R L Carpenters*, the plaintiff filed a complaint to foreclose a mechanic's lien for construction management services and carpentry labor. The services included continual coordination and planning of the project, preparation of budgets and estimates, bidding out and entering into subcontracts, overseeing the progress of subcontractors, preparation of statements submitted to the mortgagor for payment as the work progressed, as well as carpentry labor. The court held that the "consulting, planning, and budgeting" activities did not come within the customary responsibilities of a construction superintendent and were consequently nonlienable. The carpentry labor, however, was lienable. (*B R L Carpenters*, 126 Ill. App. 3d at 143.) Nevertheless, the amount claimed to be due and owing to the plaintiff could not be apportioned between the lienable and nonlienable items. Thus, the entire lien claim was held to have failed. *B R L Carpenters*, 126 Ill. App. 3d at 143-44.

In the instant case, Carl B. Bryant, the founder and sole shareholder of CDC, testified that CDC was retained by the Becks to act as construction manager on the project. In the "Preconstruction Phase," CDC agreed to provide preliminary estimates of the construction costs, recommend the most feasible construction methods and materials, develop a project construction schedule, advise on the best use of the site, arrange for the purchase of materials, provide analysis of the types and quantities of labor required, establish bidding schedules, and analyze bids and provide recommendations for awarding contracts. In addition, CDC agreed to coordinate the project with the architect and engineers, acquire necessary zoning variances, arrange for financing, and negotiate leases.

Although CDC agreed to provide services in the construction phase, Bryant testified that the only construction activities that commenced on the project before it was abandoned by the Becks involved testing the soil and drilling borings. When questioned about the lienable work that CDC performed on the property, Bryant responded that CDC worked with several architects to develop a design for the car wash, worked with the City of Libertyville concerning building and landscaping restrictions and zoning, arranged for financing with First Midwest Bank, found a tenant to lease the car wash facility,

worked with a car wash manufacturer on the equipment to be installed, bid out the project to subcontractors, performed soil tests, and drilled borings on the property. However, Bryant admitted that he did not sod, excavate, landscape, or remove structures on the property. With the exception of the borings which were drilled on the land, physical construction had not commenced at the time Bryant filed the mechanic's lien. The contract between the parties provides that payments beyond the initial $5,000 deposit were due when construction commenced. Bryant testified that the payment sought by filing the mechanic's liens encompassed "pre-construction" activities for which he charged a percentage of the final contract price.

■■ It is unclear whether the services performed by CDC were lienable. *Crowen* provides support for the assertion that a construction manager's services are lienable because the Act specifies that a "property manager" that incurs expenses or performs services on a tract of land for "any such purpose" is entitled to a lien. However, *Watson* instructs us that the services performed must enhance the value of the land. Moreover, it is clear that CDC's lien claim would fail if the payment schedule provided by the contract could not be apportioned between lienable and nonlienable services.

The Mechanics Lien Act is a creation of statute in derogation of the common law which provides extraordinary remedies to certain classes of contractors and subcontractors. As such, its technical and procedural requirements must be strictly construed. (*Prior v. First Bank & Trust Co.* (1992), 231 Ill. App. 3d 331, 333.) Once the lien claimant has complied with the statutory requirements, the Act should be liberally construed to carry out its remedial purpose of allowing recovery based on a lien where the value of the property has been increased by furnishing labor or materials. (*Delaney Electric Co. v. Schiessle* (1992), 235 Ill. App. 3d 258, 265.) Based on the *Watson* case, the services performed by CDC prior to the time the project was abandoned did not enhance the value of the property as construction never commenced. Denying a lien on this basis thwarts the purpose of the Act since it benefits the owner who has breached the contract at the expense of the contractor, who has performed substantial services and is entitled to payment.

However, we do not render an opinion concerning the lienability of services performed by CDC. The focus of our inquiry is not whether the services were lienable, but whether CDC acted with malice in recording the lien. If the case law was clear in holding that the services performed by CDC were nonlienable, the trial court could

properly conclude that CDC acted with malice. However, the court erred, as a matter of law, by equating lienability with malice.

The following colloquy illustrates the court's confusion concerning the elements required to prove a claim for slander of title:

"Q. [by Victor Henderson, counsel for the Becks]: Was there anything that you did at all from the date of the contract in July of 1988 until your relationship severed with the Becks that you felt was non-lienable?

MR. SABO [counsel for CDC]: Objection, your Honor. It calls for a legal conclusion.

MR. HENDERSON: With respect to his bill.

MR. SABO: Well, I think he's asking this witness now to draw the legal conclusion of what is lienable and what is not lienable.

MR. HENDERSON: No, I'm not. When he builds and when he filled out the lien—

THE COURT: What difference does it make whether he thought something was lienable or not lienable, if it was or wasn't?

MR. HENDERSON: Because to the extent that something is not-lienable, then it should not have been included in the mechanic's lien.

THE COURT: That's what I determine. In other words, what he thinks is lienable or not doesn't much matter, does it?

MR. HENDERSON: To the extent that it may have been included in the bill to be used as leverage to get extra, then I believe it goes to the issue possibly of malice, and to that extent it would be relevant to something that we should be able to ask.

THE COURT: I don't think so. I'm going to sustain the objection because *I think I determine whether something is lienable or not, and I don't think it much matters if he filed a lien on non-lienable matters, whether he was innocently misinformed about it or whether he—if he—or if he intended specifically to slander the title.* It may go to damages.

\* \* \*

MR. SABO: I think there is a significant difference between a situation where one files a lien knowing himself to have no rights versus someone believing that he has some rights, and that—some of the cases that we had earlier cited in this matter say just that. So to that extent, I think there is a difference.

* * *

THE COURT: Well, I'm going to sustain the objection. I don't think we should get any further into this because I think we're just going to open it up unduly, so I'll sustain the objection." (Emphasis added.)

It has been held that a party who records a lien having reasonable grounds to believe that he has title or a claim to the property has not acted with malice. (*Whildin*, 82 Ill. App. 3d at 1016; *Midwest Glass*, 34 Ill. App. 3d 130.) The court in this case determined that CDC's services were nonlienable and failed to consider whether Carl Bryant, the owner of CDC, harbored a *reasonable* belief that CDC was entitled to a lien. Contrary to the trial court's ruling which excluded such evidence, Bryant's testimony concerning knowledge of mechanic's liens was relevant to establish the element of malice. Since the court solely considered whether the services were lienable, it considered insufficient evidence of intent as proof of malice. For these reasons, the court erred, as a matter of law, by determining that nonlienability constituted proof of malice. Our review of the record fails to establish that CDC recorded the mechanic's lien with an unreasonable belief its claim was lienable. (*Whildin*, 82 Ill. App. 3d at 1016.) Thus, we determine, as a matter of law, that the Becks failed to sustain their burden of proving that CDC acted with malice in filing the mechanic's lien.

In light of our holding, it is unnecessary to address the additional issues raised by CDC concerning the judgment on the Becks' counterclaim. It is also not necessary to address the issues raised by the Becks in their cross-appeal concerning the amount of damages and interest awarded on the counterclaim.

As a final matter, however, CDC asserts that the trial court erred by failing to award post-judgment interest on the judgment which confirmed the arbitrator's award. The court's final judgment in this matter ordered that interest would accrue from April 15, 1992, the date the judgment on the counterclaim was first entered but was later determined to be nonfinal. In a subsequent order, the court clarified that no interest was assessed on the court's judgment of April 9, 1990, which confirmed an award of $58,851 entered by an arbitrator on CDC's cause of action against the Becks for breach of contract. CDC asserts that the trial court should have awarded interest on the arbitration award at the rate of 9% from the date the arbitrator's award was confirmed by the trial court on judicial review.

Section 2—1303 of the Code of Civil Procedure provides for the assessment of interest on judgments as follows:

"Judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied \*\*\*. When judgment is entered upon any award, report or verdict, interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment. \*\*\* The judgment debtor may by tender of payment of judgment, costs and interest accrued to the date of tender, stop the further accrual of interest on such judgment notwithstanding the prosecution of an appeal, or other steps to reverse, vacate or modify the judgment." (735 ILCS 5/2—1303 (West 1992).)

Section 2—1303 of the Code of Civil Procedure has been applied to allow interest on arbitration awards as well as on judgments. (*Edward Electric Co. v. Automation, Inc.* (1992), 229 Ill. App. 3d 89, 106.) However, it is unclear whether the imposition of interest on an arbitrator's award which has been confirmed by the trial court on judicial review is discretionary, or mandatorily imposed by statute.

Section 13 of the Uniform Arbitration Act, adopted in Illinois (710 ILCS 5/13 (West 1992)), requires a party seeking the modification of an award to file an application within 90 days after delivery of a copy of the award to the applicant. Since the judgment entered by the arbitrator failed to indicate that interest would be assessed, section 13 of the Uniform Arbitration Act could be interpreted to require CDC to file an application seeking modification to account for interest.

Support for this position lies in *Hadley Gear Manufacturing Co. v. Zmigrocki* (1986), 152 Ill. App. 3d 358. In *Hadley*, the defendants appealed from an order denying their request for statutory interest in connection with an arbitration award. The court attributed no merit to the defendants' suggestion that section 2—1303 of the Code of Civil Procedure must be construed to provide that the trial court is statutorily mandated to enter an award of interest. Rather, the court held that the decision to allow statutory interest in chancery matters lies within the sound discretion of the trial court. The court denied interest because there was no evidence indicating that the failure to award interest was an abuse of discretion. *Hadley*, 152 Ill. App. 3d at 359-60, citing *Robinson v. Robinson* (1986), 140 Ill. App. 3d 610, 612 (interest assessed in a proceeding for dissolution of marriage was deemed to be discretionary).

However, there is law to the contrary. In *Marriage of Scafuri* (1990), 203 Ill. App. 3d 385, we reversed the trial court's assessment of interest of 1% over the prime rate on the outstanding balance of a property settlement award in a dissolution proceeding. We reasoned

that the judgment for dissolution included the property distribution award. The property distribution was a judgment of the court and interest was mandatorily assessed at the 9% rate designated by section 2—1303. *Scafuri*, 203 Ill. App. 3d at 398.

In this case, a judgment was entered by the trial court which confirmed the award entered by the arbitrator. Because the trial court's action in confirming the arbitrator's award constituted a binding judgment, the rationale of *Scafuri* indicates that the trial court was not vested with discretion in assessing interest. Rather, interest at the rate of 9% (735 ILCS 5/2—1303 (West 1992)) should have been *mandatorily* imposed from the date the judgment was entered confirming the arbitrator's award, or April 9, 1990. See *Scafuri*, 203 Ill. App. 3d at 398.

For the foregoing reasons, we reverse the judgment of the circuit court of Lake County and remand the cause to the trial court to enter an order which specifies that interest on the arbitrator's award is due and owing from the date the arbitrator's award was confirmed on judicial review, or April 9, 1990.

Reversed and remanded.

BOWMAN and COLWELL, JJ., concur.