# Illinois Official Reports

## Appellate Court

---

**In re Parentage of Scarlett Z.-D., 2014 IL App (2d) 120266-B**

---

| | |
|---|---|
| Appellate Court Caption | *In re* PARENTAGE OF SCARLETT Z.-D., a Minor (James R.D., Petitioner-Appellant, v. Maria Z., Respondent-Appellee). |
| District & No. | Second District<br>Docket No. 2-12-0266 |
| Filed | May 22, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an appeal from the dismissal of petitioner's action seeking a declaration of parentage, custody, visitation and child support as to the adopted daughter of respondent, his former fiancée based on his lack of standing, where the Illinois Supreme Court entered a supervisory order directing the appellate court to reconsider its affirmation of the dismissal in light of the Illinois Supreme Court's recent decision in *DeHart* announcing the equitable adoption doctrine, the appellate court remanded the cause to the trial court for additional factual findings, pursuant to the equitable adoption doctrine, and a determination of whether there is a "need in justice for this extraordinary equitable intervention," with or without additional evidence or argument, or both, on the issue of equitable adoption and then either proceed to consider the child's best interests based on a finding that petitioner has standing under the equitable adoption doctrine or again dismiss his petition. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 08-F-451; the Hon. Timothy J. McJoynt, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded with directions. |

Counsel on Appeal     Keith E. Roberts, Jr., of Roberts P.C., of Wheaton, and Camilla B. Taylor, of Lamda Legal Defense & Education Fund, Inc., of Chicago, and Thomas W. Ude, Jr., of Lamda Legal Defense & Education Fund, Inc., of New York, New York, for appellant.

David W. Schopp, of Law Office of David W. Schopp, of Aurora, for appellee.

John Knight, of Roger Baldwin Foundation of ACLU, Inc., and Ari Z. Cohn and Frank M. Dickerson III, both of Mayer Brown LLP, both of Chicago, for *amicus curiae* American Civil Liberties Union.

Hugh S. Balsam and Andy J. Miller, both of Locke Lord LLP, of Chicago, for other *amici curiae*.

Joseph M. Beck, of Beck & Houlihan, P.C., of Wheaton, guardian *ad litem*.

Panel     JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justice Jorgensen concurred in the judgment and opinion.
Justice McLaren specially concurred in part and dissented in part, with opinion.

## OPINION

¶ 1     Petitioner, James R.D. (Jim), sought a declaration of parentage, custody, visitation, and child support regarding Scarlett Z.-D., the adopted daughter of his former fiancée, respondent, Maria Z. He appeals from the trial court's dismissal under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)) of his claims brought under common-law contract theories and from the court's denial, following trial, of his claims brought under the equitable parent doctrine. Initially, we affirmed. *In re Parentage of Scarlett Z.-D.*, 2012 IL App (2d) 120266. Jim filed a petition for leave to appeal with the Illinois Supreme Court. The supreme court denied his petition but also entered the following supervisory order:

> "In the exercise of this Court's supervisory authority, the Appellate Court, Second District, is directed to vacate its order in *James R.D. v. Maria Z.*, case No. 2-12-0266 [*In re Parentage of Scarlett Z.-D.*, 2012 IL App (2d) 120266]. The Appellate Court is instructed to reconsider its decision in light of this Court's opinion in *DeHart v.*

*DeHart*, [2013 IL 114137], to determine if a different result is warranted." *In re Parentage of Scarlett Z.-D.*, No. 115000 (Ill. May 29, 2013).

In accordance with our supreme court's directive, we vacate our previous order in this case. We conclude that a different result is not warranted under the law as it existed at the time of our previous order. However, to the extent of any change in the law, our reconsideration is hindered by the lack of factual findings by the trial court, which did not have the benefit of *DeHart* when it rendered its ruling. For the following reasons, we affirm the trial court's dismissal of counts III through VI, vacate its order denying counts I and II, and remand with directions for further proceedings.

## I. BACKGROUND

Jim and Maria began living together as a couple in 1999. They became engaged in 2000 or 2001. In early 2003, Maria went to Slovakia to visit family. While there, she met Scarlett, a 3½-year-old orphan girl. Maria and Jim decided that Maria would adopt Scarlett, and Maria commenced the process. Under Slovakian law, Jim was not permitted to adopt Scarlett, because he was neither a Slovakian national nor married to Maria. During the year-long adoption process, Maria lived in Slovakia. Jim remained in the United States, but he was involved in the process and traveled to Slovakia approximately five times during that period. In 2004, Maria returned to the United States with Scarlett, and the parties lived together with Scarlett as a family. The parties never married, and neither took any steps to obtain recognition of the adoption in Illinois. Jim did not legally adopt Scarlett.

By August 2008, the parties' relationship had deteriorated, and Maria moved out with Scarlett. On August 22, 2008, Jim filed a petition for declaration of parental rights. On May 11, 2009, Jim filed his second amended petition, at issue here. In count I, Jim requested a declaration of parentage and an order granting the parties joint legal and physical custody or, alternatively, granting him primary custody with reasonable visitation for Maria. In count II, Jim sought an equitable division of child support between the parties. Counts III through VI, entitled breach of oral agreement, promissory estoppel, breach of implied contract in fact, and breach of implied contract in law, respectively, each prayed for relief in the form of custody, visitation, and child support determinations.

On May 29, 2009, Maria filed a section 2-615 motion to dismiss, alleging, *inter alia*, that Jim's petition failed to state a cause of action because it did not address the threshold question of Jim's standing under either section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/601(b)(2) (West 2012)) or section 7 of the Illinois Parentage Act of 1984 (Parentage Act of 1984[1]) (750 ILCS 45/7 (West 2012)), providing for actions to determine the existence of a father-child relationship. Jim filed a response, arguing that a section 2-615 motion was not the proper vehicle to raise the issue of standing and that, therefore, Maria had waived her standing argument. The trial court entered an order allowing Maria to file a memorandum in support of her section 2-615 motion, if she so desired. Within the time allowed for that memorandum, Maria instead filed a section 2-619 (735 ILCS 5/2-619 (West 2012)) motion to dismiss, asserting lack of standing under section 601 of the Dissolution Act, based on the affirmative matter that

[1]The Parentage Act of 1984 is not to be confused with the Illinois Parentage Act (750 ILCS 40/1 *et seq.* (West 2012)), which governs cases involving artificial insemination only.

Scarlett had always been in Maria's physical custody since her adoption. Jim moved to strike Maria's section 2-619 motion.

¶ 6        On August 25, 2009, the trial court heard argument on Jim's motion to strike Maria's section 2-619 motion. In addition to arguing that the motion was untimely, Jim contended that Maria improperly raised the affirmative defense of standing in her section 2-615 motion to dismiss and had, therefore, waived the standing defense. The court began by asking Jim's counsel, "So if I let [Maria's counsel] replead and relabel it [section 2-]619, are we right back where we started?" After hearing the parties' arguments, the court noted that "standing is the linchpin of the attacking motions that were up for hearing." The court reasoned that, "whether it's a 2-615 or a 2-619, I think it's been adequately pled in a timely fashion." The court found that the issue of standing was not a surprise to Jim. The court concluded that "[t]here's been no waiver." The court then offered Jim the option of allowing Maria to refile her section 2-615 motion as a section 2-619 motion so that Jim could supplement his response "with affidavits and the like." Jim's counsel asked if a temporary visitation order could be entered if they chose to replead, and the court said no. Maria's counsel reminded the court that Maria had already filed the section 2-619 motion. Jim then opted to accept the additional time offered to submit affidavits and file a response to Maria's section 2-619 motion, which he did.

¶ 7        On October 7, 2009, the trial court heard argument on both of Maria's motions to dismiss. The court denied Maria's section 2-619 motion in its entirety. With respect to Maria's section 2-615 motion, the court denied the motion as to counts I and II. However, the court granted the motion to dismiss counts III through VI, concluding that there was no common-law cause of action for paternity, that the claims did not meet the elements of contract law, and that the purported contracts "could be void [as] against public policy."

¶ 8        From that portion of the court's October 7, 2009, order denying her section 2-619 motion to dismiss, Maria filed a petition for leave to appeal to this court. We denied the petition as untimely. *In re Parentage of Scarlett Z-D.*, No. 2-09-1280 (2009) (unpublished order under Supreme Court Rule 23).

¶ 9        Thereafter, the case proceeded on counts I and II of Jim's petition, in which Jim requested a declaration of parentage, custody, and visitation (count I) and child support (count II). Jim asserted that he was Scarlett's parent under the theories of *de facto* parent, equitable parent, and psychological parent or that he stood *in loco parentis* to Scarlett. Maria filed her response to Jim's petition, raising the affirmative defense of standing. The court appointed a guardian *ad litem* (GAL) and ordered the parties to attend mediation. On the GAL's motion, the court ordered that Jim have supervised visitation with Scarlett. Scarlett attended counseling. The court appointed a custody evaluator. Later, the court appointed a visitation facilitator to facilitate visits and make a report of her observations.

¶ 10        Trial commenced on May 10, 2011, spanning 17 days of testimony over 7 months. The parties presented extensive evidence. The witnesses included the parties, Dr. Robert Shapiro (the custody evaluator), Dr. Margot Warren (the visitation facilitator), and Joseph Beck (the GAL), as well as many friends, neighbors, and relatives of the parties. Numerous exhibits were admitted, including Dr. Shapiro's custody evaluation, Dr. Warren's observation notes, family photographs and videos, and Scarlett's school records and art work.

¶ 11        The parties rested their respective cases on December 16, 2011. The court granted Maria's previously filed motion for an *in camera* interview of Scarlett and conducted the

interview that day. On January 23, 2012, the parties submitted written closing arguments. On February 9, 2012, the court granted Maria's motion to supplement her closing argument with the February 2, 2012, decision in *In re Marriage of Mancine*, 2012 IL App (1st) 111138, *appeal denied and judgment vacated by Mancine v. Gansner*, No. 113978 (Ill. May 29, 2013) (directing the First District to vacate its order and reconsider in light of *DeHart*).

¶ 12    The trial court entered its written opinion and order on February 29, 2012. The court found that "for a long time during and after the adoption of [Scarlett], Jim and Maria lived together with the child as an intact family unit as if they were bound legally." The court found that Jim and Maria planned and participated in the adoption together and that Jim paid for it all and supported Maria during the process. The court found that Jim never adopted Scarlett but that the parties had "discussed" it. The court stated, "The reasons for these inactions are basically unknown except for the 'falling out' Jim and Maria had some time later." The court found that, for four years or more, Scarlett lived with Jim, called him "daddy," and looked to him as a "father figure." The court concluded that Jim was "a fit and proper person" to have visitation or custody. The court found that, after Maria separated from Jim and took Scarlett with her, Scarlett "expressed a desire to continue to see Jim[,] and Maria prevented and blocked such contact." The court believed that the GAL's request for visitation early in the case reflected Scarlett's desires at that time. The court found "considerable evidence that taking Jim out of [Scarlett's] life in 2008 was not good for [her]." The court noted that Dr. Warren, who had observed over 50 visits between Jim and Scarlett, and Dr. Shapiro, who had evaluated Scarlett, both concluded that Jim and Scarlett shared a bond and that Maria had alienated Scarlett from Jim. The court stated that it disregarded the *in camera* interview with Scarlett because it "became immediately obvious to the court that the child was committed to telling the court that she no longer want[ed] to see Jim." The court concluded that Scarlett had been "coached" and "corrupted" and that these were not "her true thoughts." The court said, "[I]t is obvious that the court is unhappy with Maria's conduct in this case and is quite sympathetic to Jim's position. And more importantly, the court is very concerned that finding against Jim will take him out of [Scarlett's] life and that this will be bad for [her] and not in her best interests."

¶ 13    Still, the court noted that it was "bound to follow the law as it exists now" and that, despite its concerns regarding best interests, it could not, under current law, reach that issue without first finding that Jim had standing. The court observed that "the standing issue never really changed in the trial." The court found that "Maria correctly argue[d] she is the sole parent and Jim has no statutory legal standing." The court also noted Maria's constitutional right to parent "the way she chooses–good or bad," but expressed concern about Scarlett's right "to have a decent life." The court remarked that "these situations *** need legislation badly" but that it was "without authority to invent new common[-]law theories or somehow create judicial legislation." The court concluded that, especially under *Mancine*, it had no basis to find that Jim had standing. The court denied counts I and II of Jim's petition and vacated all of its prior orders regarding visitation and counseling.

¶ 14    Also on February 29, 2012, the trial court denied Jim's oral motion for a stay of that portion of its order vacating all prior visitation and counseling orders. Jim timely appealed from the court's denial of his petition. He subsequently filed an emergency motion in this court pursuant to Illinois Supreme Court Rule 305(d) (eff. July 1, 2004), seeking to stay the

trial court's order vacating its previous orders for visitation and counseling, which we granted.[2]

¶ 15   Thereafter, we granted leave to the American Civil Liberties Union of Illinois and, jointly, to the Family Institute at Northwestern University, the Chicago Appleseed Fund for Justice, and the Family Equality Council, to file briefs as *amici curiae* in support of Jim. Following our supreme court's supervisory order, Maria filed an unopposed motion to establish a briefing schedule, which we granted. Jim timely filed an opening and reply brief on reconsideration; Maria timely filed a response brief on reconsideration.

¶ 16                                    II. ANALYSIS

¶ 17            A. Counts I and II: Parentage, Custody, Visitation, and Support Claims

¶ 18   We begin our analysis by reviewing the arguments originally raised in the initial briefing. After establishing that foundation, we will reconsider our decision and determine if a different result is warranted in light of *DeHart*.

¶ 19   This case centers on the issue of standing. Section 601(b) of the Dissolution Act provides that a custody proceeding may be commenced by a parent (750 ILCS 5/601(b)(1) (West 2012)) or "by a person other than a parent *** but only if [the child] is not in the physical custody of one of his parents" (750 ILCS 5/601(b)(2) (West 2012)). Our supreme court has interpreted section 601(b)(2) as a standing requirement. *In re R.L.S.*, 218 Ill. 2d 428, 434-35 (2006). The Dissolution Act does not define the term "parent." The Parentage Act of 1984 establishes a "statutory mechanism that serves to legally establish parent and child relationships in Illinois." (Internal quotation marks omitted.) *J.S.A. v. M.H.*, 224 Ill. 2d 182, 198 (2007). Section 2 of the Parentage Act of 1984 provides that a " 'parent and child relationship' means the legal relationship existing between a child and his natural or adoptive parents incident to which the law confers or imposes rights, privileges, duties, and obligations." 750 ILCS 45/2 (West 2012). In the context of a nonparent seeking custody under section 601(b)(2) of the Dissolution Act, standing is a threshold issue that the trial court must decide before proceeding to a best-interests determination. *In re Custody of M.C.C.*, 383 Ill. App. 3d 913, 917 (2008) (stating that a nonparent must meet section 601(b)(2)'s standing requirement before the trial court may proceed to the merits of the custody petition).

¶ 20   Section 601(b)(2)'s standing requirement is "designed to 'ensure[ ] that the superior right of natural parents to the care and custody of their children is safeguarded.' " *In re A.W.J.*, 197 Ill. 2d 492, 497 (2001) (quoting *In re Petition of Kirchner*, 164 Ill. 2d 468, 491 (1995), *abrogated on other grounds by R.L.S.*, 218 Ill. 2d at 444-47). The superior rights doctrine recognizes parents' interest in the care, custody, and control of their children, which is " 'perhaps the oldest of the fundamental liberty interests.' " *R.L.S.*, 218 Ill. 2d at 438 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.)). Fit parents enjoy a presumption that they act in the best interests of their children. *R.L.S.*, 218 Ill. 2d at 439 (citing *Troxel*, 530 U.S. at 68). "[S]o long as a parent adequately cares for his or her children (*i.e.*, is fit), there will normally be no reason for the State to inject itself into the private realm of the

---

[2]We lifted this stay when we filed our previous opinion on August 30, 2012. *Scarlett Z.-D.*, 2012 IL App (2d) 120266, ¶ 58.

family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children." *Troxel*, 530 U.S. at 68-69 (holding a Washington grandparent visitation statute unconstitutional as applied because it allowed the petitioners to proceed straight to a best-interests analysis without any deference accorded to the parent's decision to limit grandparent visitation).

¶ 21　　Indeed, the superior rights doctrine permeates the statutory schemes governing family law in Illinois. See *R.L.S.*, 218 Ill. 2d at 435 (observing that the superior rights doctrine is incorporated into the Probate Act's provision allowing appointment of a guardian only if the minor does not have a parent who " 'is willing and able to make and carry out day-to-day child care decisions concerning the minor' " (quoting 755 ILCS 5/11-5(b) (West 2004))); *In re A.L.*, 2012 IL App (2d) 110992, ¶¶ 14-16 (noting that, because parents' fundamental liberty interests were implicated in termination-of-parental-rights proceedings, the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 2004)) requires that the State must first prove by a preponderance of the evidence that a child is neglected, abused, or dependent, then prove by clear and convincing evidence that the parent is unfit, and finally the court must determine that termination of parental rights is in the child's best interest); *In re Parentage of Unborn Child Brumfield*, 284 Ill. App. 3d 950, 954 (1996) (holding that section 601(b)(2)'s standing requirement in the Dissolution Act applied to parties in cases under the Parentage Act of 1984).

¶ 22　　　　　　　　　　　　　　　　1. Waiver[3]

¶ 23　　Jim initially argued in his original briefs that Maria waived the issue of standing by failing to file a timely section 2-619 motion. "A motion to dismiss pursuant to section 2-619 [of the Code] admits the legal sufficiency of a complaint, but asserts affirmative matters that avoid or defeat the allegations contained in the complaint." (Internal quotation marks omitted.) *Gallagher v. Union Square Condominium Homeowner's Ass'n*, 397 Ill. App. 3d 1037, 1040 (2010). Under section 2-615 of the Code, a complaint may be dismissed for failure to state a cause of action because of factual or legal insufficiency. *Cummings v. City of Waterloo*, 289 Ill. App. 3d 474, 478 (1997).

¶ 24　　Here, Maria alleged in her section 2-615 motion that Jim's petition did not state a cause of action because it failed to address the threshold issue of standing under either the Dissolution Act or the Parentage Act of 1984. We cannot say that it was improper to raise the standing issue in a section 2-615 motion,[4] because the issue was raised as a factual insufficiency on the face of the petition, namely, that Jim failed to allege any facts that would have brought him within the purview of either the Dissolution Act or the Parentage Act of

---

[3]Because the parties use the term "waiver," we do as well. However, we recognize that "[w]hile waiver is the voluntary relinquishment of a known right, forfeiture is the failure to timely comply with procedural requirements." *Buenz v. Frontline Transportation Co.*, 227 Ill. 2d 302, 321 n.2 (2008).

[4]We are aware of cases holding that lack of standing under section 601(b)(2) is an affirmative defense that is waived if not raised in a timely section 2-619 motion to dismiss. See, *e.g.*, *In re Custody of K.P.L.*, 304 Ill. App. 3d 481, 487 (1999). However, we are convinced that, under the circumstances presented here, Maria could properly raise standing in a section 2-615 motion. In any event, the trial court had discretion to allow Maria's tardy section 2-619 motion because it did not prejudice Jim.

1984. See *Cummings*, 289 Ill. App. 3d at 479 ("[A] factually insufficient complaint fails to allege sufficient facts essential to the cause of action."). That Maria subsequently raised lack of standing, based on the affirmative matter that Scarlett was in Maria's physical custody, in a section 2-619 motion, although arguably untimely and filed without leave, does not change the fact that the issue of standing had already been raised. We agree with the trial court that standing was the "linchpin" of both motions to dismiss and that "[t]here's been no waiver." We note that Jim does not, indeed cannot, argue that he was prejudiced, because, as the trial court pointed out, the issue of standing was clearly at issue and not a surprise. Accordingly, Jim's waiver argument has no merit. See *In re Custody of McCarthy*, 157 Ill. App. 3d 377, 380-81 (1987) (holding that, where there was no prejudice, the trial court did not abuse its discretion in allowing a tardy motion to dismiss based on a defense not raised in the answer).

¶ 25                                    2. Equitable Estoppel

¶ 26    Jim next contends that Maria should have been equitably estopped from challenging Jim's standing. He maintains that equitable estoppel applies because Maria actively encouraged Jim and Scarlett to form a father-child relationship and held them out to the world as such. We review under the manifest-weight-of-the-evidence standard the trial court's determination that equitable estoppel did not apply. *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33.

¶ 27    Our supreme court has listed the factors necessary to prove equitable estoppel:

> "(1) the other person misrepresented or concealed material facts; (2) the other person knew at the time he or she made the representations that they were untrue; (3) the party claiming estoppel did not know that the representations were untrue when they were made and when they were acted upon; (4) the other person intended or reasonably expected that the party claiming estoppel would act upon the representations; (5) the party claiming estoppel reasonably relied upon the representations in good faith to his or her detriment; and (6) the party claiming estoppel would be prejudiced by his or her reliance on the representations if the other person is permitted to deny the truth thereof." *Geddes v. Mill Creek Country Club, Inc.*, 196 Ill. 2d 302, 313-14 (2001).

"Without the misrepresentation or concealment of a material fact, equitable estoppel does not apply." *Parks v. Kownacki*, 193 Ill. 2d 164, 180 (2000) (citing *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 492 (1997)). Although fraud is an essential element of equitable estoppel, "the representation need not be fraudulent in the strict legal sense or done with an intent to mislead or deceive." *Geddes*, 196 Ill. 2d at 314. "[I]t is sufficient that a fraudulent or unjust effect results from allowing another person to raise a claim inconsistent with his or her former declarations." *Geddes*, 196 Ill. 2d at 314 (holding that the plaintiffs were estopped from bringing their claims of intentional trespass and private nuisance based on golf balls entering their property where they previously had agreed to the location of the defendants' fairway).

¶ 28    Here, Jim did not identify a single fact that Maria misrepresented. The record contains no evidence that Maria misrepresented Jim as Scarlett's biological or adoptive father. Jim was aware at all times that he was not Scarlett's biological father, that the Slovakian adoption did not pertain to him, and that formal adoption in Illinois would be necessary. Although Jim testified that it was the parties' intent that both of them would pursue adoption of Scarlett in

this country, a promise to do something in the future does not constitute a factual misrepresentation (see *Gilliland v. Allstate Insurance Co.*, 69 Ill. App. 3d 630, 634 (1979) ("To invoke the doctrine of [equitable] estoppel, a false representation must generally relate to an existing or past event, not to a promise concerning a future happening.")).

¶ 29    Moreover, that Maria encouraged a father-daughter relationship between Jim and Scarlett and allowed Jim to become, as the trial court found, a father figure to Scarlett does not compel the conclusion that it is somehow unjust to allow Maria to assert Jim's lack of standing. Maria's claim that Jim lacked standing was not "inconsistent with *** her former declarations" (*Geddes*, 196 Ill. 2d at 314). Maria's conduct and declarations in treating Jim like Scarlett's father occurred when the parties were engaged to be married. In short, Jim's relationship with Scarlett was contingent upon his relationship with Maria, Scarlett's only legal parent. Thus, Maria's assertion–when the parties' relationship had terminated–that Jim was not a legal parent was not inconsistent with her prior behavior. Because the record demonstrates that there was no misrepresentation of a material fact, Jim failed to satisfy the first element of equitable estoppel. Accordingly, the trial court's conclusion that equitable estoppel did not apply was not against the manifest weight of the evidence.

¶ 30    Jim cites *Geddes* for the proposition that "[i]t is the duty of a person having a right, and seeing another about to commit an act infringing upon it, to assert his right. He cannot by his silence induce or encourage the commission of the act and then be heard to complain." (Internal quotation marks omitted.) *Geddes*, 196 Ill. 2d at 314. As explained above, the rights at issue here are the rights of a parent to direct the upbringing of his or her child and to make decisions about the child's care. See *Troxel*, 530 U.S. at 65. Jim developed a relationship with Scarlett, with Maria's consent and encouragement, while the parties were engaged. After the parties' relationship terminated, Maria decided not to allow Scarlett to see Jim anymore. When Jim filed his petition seeking custody and visitation–against Maria's wishes–she timely asserted her rights.

¶ 31    In support of his equitable estoppel argument, Jim relies on *In re Marriage of Schlam*, 271 Ill. App. 3d 788 (1995). In *Schlam*, the biological mother of a child married a man, not the child's father, when the child was about six years old. The wife represented the husband as the child's father, and the husband and child formed a close father-daughter relationship. When the parties divorced about six years later, they entered into a joint parenting agreement, which was incorporated into the judgment of dissolution. *Schlam*, 271 Ill. App. 3d at 791. For about two years thereafter, the husband provided financially for the child and exercised his joint custody rights. *Schlam*, 271 Ill. App. 3d at 791-92. After a dispute between the parties, the husband filed a petition alleging that the wife violated the joint parenting agreement, and the wife responded with a petition to declare the agreement void *ab initio*. *Schlam*, 271 Ill. App. 3d at 790. The appellate court held that the wife was equitably estopped from challenging the agreement, because the husband had obligated himself to pay child support in reliance on the wife's intentional representation to the trial court that the husband would remain a part of the child's life. *Schlam*, 271 Ill. App. 3d at 794-95.

¶ 32    *Schlam* is inapposite. The court in *Schlam* applied the doctrine of equitable estoppel not to preclude the wife from challenging standing, as Jim seeks to do here, but rather to preclude the wife from challenging the parties' parenting agreement. Moreover, estoppel was based not on the wife's conduct in holding the husband out as the child's father, but on her conduct in representing to the trial court that joint custody was in the child's best interests, thus

implicitly representing that the husband had standing to seek joint custody (*Schlam*, 271 Ill. App. 3d at 796). In contrast, here, Maria never made any representation to the trial court of a father-daughter relationship but timely asserted Jim's lack of standing. In *Schlam*, because the wife's representations were made at the end of the parties' relationship and incorporated into the trial court's dissolution order, it was reasonable to believe that the wife's representations constituted her permanent intent. In the present case, Maria made no representations regarding a continued relationship between Scarlett and Jim following the parties' separation. That Maria allowed Jim to see Scarlett for a few months following the separation is indicative of a gratuitous undertaking that she had the right to revoke. See *In re Marriage of Engelkens*, 354 Ill. App. 3d 790, 798 (2004) (holding that the father was not estopped from challenging the parties' temporary agreed order regarding visitation for the stepmother, who had included the child on her health insurance for years in "a gratuitous undertaking").

¶ 33                           3. Standing Under Equitable Parent Doctrine

¶ 34        We now turn to Jim's argument that the trial court erred in denying counts I and II of his petition, for lack of standing. Jim does not dispute the trial court's conclusion that he lacks statutory standing. Because he is not Scarlett's biological or legally adoptive father, Jim does not meet the definition of a parent under section 2 of the Parentage Act of 1984. Neither does Jim meet the standing requirement for nonparents in section 601(b)(2) of the Dissolution Act, since Scarlett has always been in Maria's physical custody. Rather, Jim contends that, based on his parent-child relationship with Scarlett, formed with Maria's consent and encouragement, he properly sought a declaration of parentage, custody, visitation, and child support under the theories of equitable parent, *de facto* parent, psychological parent, and *in loco parentis*.[5]

¶ 35        Generally, we review *de novo* a trial court's determination on standing. *In re Guardianship of K.R.J.*, 405 Ill. App. 3d 527, 535 (2010). Although the trial court heard extensive evidence and made factual findings, which we would review under the manifest-weight-of-the-evidence standard (*K.R.J.*, 405 Ill. App. 3d at 535), the parties do not challenge the court's factual findings. Thus, the standing issue presented here is purely a question of law, which we review *de novo*. See *In re Avery S.*, 2012 IL App (5th) 100565, ¶ 13.

¶ 36        As discussed above, the legislative scheme in section 601(b)(2) of the Dissolution Act permitting nonparents to seek custody "*only if* [the child] is not in the physical custody of one of his parents" serves to prevent unconstitutional state interference with parents' fundamental liberty interests unless necessary to protect the health, safety, and welfare of children. (Emphasis added.) 750 ILCS 5/601(b)(2) (West 2012); see *Wickham v. Byrne*, 199 Ill. 2d 309, 316-17 (2002); *In re Custody of T.W.*, 365 Ill. App. 3d 1075, 1084 (2006). Jim's assertion of standing is based upon his alleged status as an equitable parent. In essence, Jim argues that he is not required to meet the nonparent standing requirement, because he is a functional parent–an equitable parent. See 750 ILCS 5/601(b)(1) (West 2012) (providing that a custody proceeding may be commenced by a parent). However, neither the legislature nor

_____

[5]For the sake of simplicity, we will refer to these doctrines collectively as the equitable parent doctrine, as they are generally used interchangeably to refer to persons functioning as parents.

the Illinois courts have ever recognized the equitable parent doctrine. *In re T.P.S.*, 2012 IL App (5th) 120176, ¶ 64. Accordingly, the trial court properly concluded that it had no basis upon which to find that Jim had standing.

¶ 37 In support of his position, Jim relies on *In re Parentage of M.J.*, 203 Ill. 2d 526 (2003), and *T.P.S.* In *M.J.*, the trial court dismissed a biological mother's complaint against her former paramour in which she sought to establish paternity and impose child support. *M.J.*, 203 Ill. 2d at 529. The mother alleged that her paramour had orally consented to her being artificially inseminated and had agreed to support the twins born as a result. *M.J.*, 203 Ill. 2d at 530-31. Upon discovering that the man was married, the mother filed suit to establish paternity and to impose a support obligation, seeking relief both under common-law theories of breach of an oral agreement and promissory estoppel and under the Illinois Parentage Act (750 ILCS 40/1 *et seq.* (West 1998)). *M.J.*, 203 Ill. 2d at 531. The appellate court affirmed, but the supreme court reversed as to the common-law claims. *M.J.*, 203 Ill. 2d at 529.

¶ 38 The supreme court first explained that the legislature enacted the Illinois Parentage Act "to define the legal relationships of a child born to a wife and husband requesting and consenting to *** artificial insemination." (Internal quotation marks omitted.) *M.J.*, 203 Ill. 2d at 533. Based on the statute's express language, the court concluded that the Illinois Parentage Act's primary purpose was to "provide a legal mechanism for a husband and wife to obtain donor sperm for use in artificial insemination and to ensure that a child is considered the legitimate child of the husband and wife requesting and consenting to the artificial technique." *M.J.*, 203 Ill. 2d at 534; see 750 ILCS 40/2 (West 1998) (providing that a child born as the result of artificial insemination "shall be considered at law in all respects the same as a naturally conceived legitimate child"). Because the statutory language unequivocally required written consent in order to establish the parent-child relationship (750 ILCS 40/3(a) (West 1998)), the court held that failure to obtain the paramour's written consent precluded the mother's child support claims brought under the Illinois Parentage Act. *M.J.*, 203 Ill. 2d at 535. Given its holding, the court noted that it did not need to determine whether the Illinois Parentage Act applied to unmarried persons. *M.J.*, 203 Ill. 2d at 537.

¶ 39 The court then turned to the mother's common-law claims for child support. *M.J.*, 203 Ill. 2d at 537. The court noted Illinois's strong public policy "recognizing the right of every child to the physical, mental, emotional, and monetary support of his or her parents." *M.J.*, 203 Ill. 2d at 539 (citing 750 ILCS 45/1.1 (West 1998)). The court observed that "statutes and case law do not equivocate in imposing child support obligations for other children born out of wedlock." *M.J.*, 203 Ill. 2d at 541. The court pointed out that the mother had alleged facts demonstrating the paramour's "deliberate course of conduct with the precise goal of causing the birth of these children." *M.J.*, 203 Ill. 2d at 541. The court reasoned that "if an unmarried man who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law." *M.J.*, 203 Ill. 2d at 541. Based on this reasoning, the court held that the mother's common-law claims for child support could proceed. *M.J.*, 203 Ill. 2d at 541. The court limited its holding "to the unique circumstances of this case" (*M.J.*, 203 Ill. 2d at 542), explaining that "[c]laims of parentage and support of children produced as a result of assisted reproductive technologies are unique" (*M.J.*, 203 Ill. 2d at 541).

- 11 -

¶ 40    In *T.P.S.*, the Appellate Court, Fifth District, relied heavily on *M.J.* to allow common-law custody and visitation claims under contract and promissory-estoppel theories for children born by artificial insemination. In *T.P.S.*, a lesbian couple planned to have children by artificial insemination. They agreed that the respondent would be artificially inseminated (because she was the younger of the two and had health insurance) and that the petitioner would be the children's primary caregiver. *T.P.S.*, 2012 IL App (5th) 120176, ¶ 6. Two children were born, and the parties functioned as equal coparents. *T.P.S.*, 2012 IL App (5th) 120176, ¶¶ 7, 12. The respondent agreed that the petitioner was to "have legal parental rights to the children that were equal to hers." *T.P.S.*, 2012 IL App (5th) 120176, ¶ 8. Ultimately, the parties' relationship deteriorated, and the respondent subsequently denied the petitioner contact with the children. *T.P.S.*, 2012 IL App (5th) 120176, ¶ 13. The petitioner filed suit seeking a declaration of parentage, custody, visitation, and child support under various common-law theories: contract, promissory estoppel, *de facto* parent, *in loco parentis*, and due process under an equitable parent theory. *T.P.S.*, 2012 IL App (5th) 120176, ¶¶ 16-17, 64-65. The trial court granted the respondent's motion to dismiss for lack of standing. *T.P.S.*, 2012 IL App (5th) 120176, ¶ 18.

¶ 41    On appeal, the court applied *M.J.*'s analysis for cases involving artificial insemination. *T.P.S.*, 2012 IL App (5th) 120176, ¶¶ 32-41. The court reiterated "Illinois's public policy recognizing 'the right of every child to the physical, mental, emotional, and monetary support of his or her *parents*.' " (Emphasis in original.) *T.P.S.*, 2012 IL App (5th) 120176, ¶ 34 (quoting *M.J.*, 203 Ill. 2d at 539). Based on that "strong public policy language," the court reasoned that the children had a right not only to the petitioner's monetary support, as in *M.J.*, but also to her physical, mental, and emotional support. *T.P.S.*, 2012 IL App (5th) 120176, ¶ 36. The court explained that the basis of recognizing parental rights was not biological or statutory but rather the fact that the petitioner actively had planned and arranged "for the procreation of these children and cared for them as a parent pursuant to an express agreement with the biological mother." *T.P.S.*, 2012 IL App (5th) 120176, ¶ 62. Based on this reasoning, the court reversed the dismissal of the contract and promissory-estoppel claims. *T.P.S.*, 2012 IL App (5th) 120176, ¶ 67. Notably, however, the court affirmed the dismissal of the claims based on the common-law theories of equitable parent, *de facto* parent, and *in loco parentis*, and on due process, because Illinois law does not recognize those theories as bases for custody or visitation claims. *T.P.S.*, 2012 IL App (5th) 120176, ¶¶ 64-65.

¶ 42    Neither *M.J.* nor *T.P.S.* compels recognizing Jim as a parent in the present case, because neither recognized the theory of equitable parent as a basis to assert standing to bring custody, visitation, and support claims. As noted, *T.P.S.* expressly stated that Illinois does not recognize the equitable parent doctrine. *T.P.S.*, 2012 IL App (5th) 120176, ¶ 65.

¶ 43    Additionally, *M.J.* and *T.P.S.* are inapposite, because the courts in both of those cases expressly limited their holdings to cases involving children born by artificial insemination (*M.J.*, 203 Ill. 2d at 541-42; *T.P.S.*, 2012 IL App (5th) 120176, ¶ 23). As the court in *M.J.* recognized, the Illinois Parentage Act is unique in explicitly conferring the status of legal parent on a husband consenting to the artificial insemination of his wife. *M.J.*, 203 Ill. 2d at 535 (noting that "section 3(a) provides for the establishment of a parent-child relationship"). Further, section 3(b) of the Illinois Parentage Act provides that the semen donor for the artificial insemination procedure "shall be treated in law as if he were not the natural father

of a child thereby conceived." 750 ILCS 40/3(b) (West 2012); see *M.J.*, 203 Ill. 2d at 534 (observing that section 3(b) eliminated the fear that the donor might claim paternity as well as protected the donor from child support claims). Thus, the Illinois Parentage Act operates both to create a legal parent-child relationship between the child and the consenting husband of the artificially inseminated wife (despite the absence of biological ties) and simultaneously to eradicate the parental status of the sperm donor (despite the presence of a biological relationship). The courts in *M.J.* and *T.P.S.* did not reach the question of whether the Illinois Parentage Act applied to unmarried persons. *M.J.*, 203 Ill. 2d at 537; *T.P.S.*, 2012 IL App (5th) 120176, ¶ 27 n.1. Nonetheless, based on the parties' deliberate conduct intended to cause children to be born by artificial insemination, the courts in *M.J.* and *T.P.S.* essentially imposed a parental status on persons not otherwise legally recognized as parents. *M.J.*, 203 Ill. 2d at 541 (reasoning that a person who engages in a deliberate course of conduct with the precise goal of causing the birth of a child should receive the same treatment in the eyes of the law as an unmarried man who biologically causes conception through sexual relations without the premeditated intent of causing a birth); *T.P.S.*, 2012 IL App (5th) 120176, ¶¶ 37, 39, 41, 59, 60, 62 (describing as a parent the biological mother's partner who actively planned and participated in the decision and process of artificial insemination to cause a child to be born). In light of the Illinois Parentage Act's exclusion of the sperm donor as father, the public policy that all children be supported by their *parents* could be effectuated in *M.J.* and *T.P.S.* only by the recognition of parental responsibility (*M.J.*) and of parental rights (*T.P.S.*) in persons not elsewhere recognized as legal parents.[6]

¶ 44    In the present case, Scarlett was not born by artificial insemination. Whatever the extent of Jim's participation in Maria's adoption of Scarlett, he did nothing to cause her to be born. Key to the courts' recognition of parental status in both *M.J.* and *T.P.S.* was the presence of a deliberate course of conduct intended to bring about the birth of a child by artificial insemination. *M.J.*, 203 Ill. 2d at 541 (reasoning that "if an unmarried man who biologically causes conception through sexual relations without the premeditated intent of birth is legally obligated to support a child, then the equivalent resulting birth of a child caused by the deliberate conduct of artificial insemination should receive the same treatment in the eyes of the law"); *T.P.S.*, 2012 IL App (5th) 120176, ¶ 62 (explaining that the petitioner had been "intimately involved in the planning and arrangement for the procreation of these children"). Accordingly, the limited holdings in *M.J.* and *T.P.S.*, allowing support, visitation, and custody claims in artificial insemination cases to proceed under common-law contract and promissory-estoppel theories, are not applicable here.

¶ 45    Moreover, in none of his briefs has Jim cited any Illinois case on point that would allow him to pursue visitation and custody claims under the equitable parent doctrine. Jim's reliance on *Koelle v. Zwiren*, 284 Ill. App. 3d 778 (1996), is not persuasive. In *Koelle*, after the biological mother deceived the plaintiff by telling him that he was the child's biological father, the plaintiff acted as the child's father for eight years. *Koelle*, 284 Ill. App. 3d at 781-82. When the plaintiff discovered that he was not the child's father, he filed suit seeking,

---

[6]Given that the courts in both *M.J.* and *T.P.S.* recognized the nonbiological "parents" as parents, the superior rights doctrine, protecting parents' fundamental liberty interests, was not implicated. See *In re Custody of Ayala*, 344 Ill. App. 3d 574, 585 (2003) ("Neither parent's right to custody, control and care of their child is superior to that of the other parent.").

*inter alia*, visitation based on equitable principles. *Koelle*, 284 Ill. App. 3d at 782. The appellate court relied on *In re Custody of Townsend*, 86 Ill. 2d 502 (1981), to conclude that "awarding custody or visitation rights to a nonparent over the objection of a natural parent is permissible if it would be in the best interests of the child." *Koelle*, 284 Ill. App. 3d at 784. We have serious doubts that the reasoning employed by the court in *Koelle*, decided before *Troxel*, would survive scrutiny under a *Troxel* analysis, because it placed a nonparent on equal footing with a parent and completely bypassed the superior rights doctrine. And, in fact, in *R.L.S.*, our supreme court abrogated *Townsend* and a line of pre-*Troxel* cases that had held that a fit parent's custody rights are subservient to the child's best interests. *R.L.S.*, 218 Ill. 2d at 444, 447-48. Moreover, the particularly egregious facts of *Koelle*, where the mother lied to the plaintiff about his paternity for eight years, are not present in the instant case.

¶ 46    Jim's reliance on *In re Ashley K.*, 212 Ill. App. 3d 849 (1991), is also unavailing. In *Ashley K.*, the child was taken into protective custody after she was born addicted to heroin. *Ashley K.*, 212 Ill. App. 3d at 853. The child then became "caught in the quagmire of the bureaucratic maze," never receiving the dispositional hearing to which she was entitled within 18 months of her placement. *Ashley K.*, 212 Ill. App. 3d at 873. After the child had lived for five years in a stable home with her foster parents, the biological parents filed a petition to regain custody, which the trial court granted. *Ashley K.*, 212 Ill. App. 3d at 873-74. The appellate court reversed and remanded for a new hearing on the parents' custody petition, based on the child's best interests. *Ashley K.*, 212 Ill. App. 3d at 890-91. Although the court referred to the foster parents as the *de facto* parents (*Ashley K.*, 212 Ill. App. 3d at 874), the court was not called upon to address the issue of a nonparent's standing. Not only were the legal issues different from those in the present case, but also the egregious facts of *Ashley K.* are clearly distinguishable. Here, since her adoption Scarlett has never lived apart from Maria, and Jim has never challenged Maria's fitness and does not dispute the trial court's finding that he and Maria were "both hands on good attentive parents."

¶ 47    In his brief on reconsideration, Jim further cites the recent case of *In re Parentage of J.W.*, 2013 IL 114817, which, though recognizing that today's families often do not fit the traditional paradigm (*J.W.*, 2013 IL 114817, ¶ 48), had nothing whatsoever to do with common-law claims for visitation or custody, or the concept of an equitable parent. Rather, the court in *J.W.* engaged in statutory interpretation of the Parentage Act of 1984 to construe its interrelationship with the Dissolution Act. *J.W.*, 2013 IL 114817, ¶¶ 36, 50 (holding that the biological father, who established his paternity under the Parentage Act of 1984 more than six years after the child's birth, was not entitled to the presumption that visitation was in the child's best interests (under section 607 of the Dissolution Act) but was required to prove that visitation was in the child's best interests (under section 602 of the Dissolution Act)).

¶ 48    The remaining cases that Jim cites in support of his argument that he has standing as an equitable parent are also inapposite. See, *e.g.*, *Hawkins v. Hawkins*, 102 Ill. App. 3d 1037, 1039 (1981) (recognizing that a common-law tradition of allowing grandparent visitation was not supplanted by an early version of the Dissolution Act that did not provide for any nonparent visitation); *Cebrzynski v. Cebrzynski*, 63 Ill. App. 3d 66, 67, 73 (1978) (examining the Probate Act and affirming the trial court's grant of physical custody to stepmother with visitation to the biological mother where the stepmother had had actual physical custody of the children for over three years); *Look v. Look*, 21 Ill. App. 3d 454, 456-57, 459 (1974)

(affirming the trial court's order granting custody to the grandparents instead of the biological father where the child had lived with the grandparents for five years).

¶ 49       Both Jim, in his original briefs, and the Illinois ACLU, in its *amicus* brief, cited a litany of out-of-state cases in support of the proposition that this court should recognize Jim's standing as an equitable parent. Cases from our sister states are not binding on this court. See *Grafner v. Department of Employment Security*, 393 Ill. App. 3d 791, 801 (2009). Neither do we find them persuasive, because they are not representative of Illinois law, which, as we have discussed, has never recognized the equitable parent doctrine as a basis to bring a custody or visitation claim. Most of the cases cited are based on either a specific state statute granting standing to a nonparent petitioner or on well-established common law within that state. See, *e.g.*, *Mullins v. Picklesimer*, 317 S.W.3d 569 (Ky. 2010) (holding that the biological mother's former same-sex partner had standing to seek custody under a statute granting standing to a nonparent who has physical custody and was acting as a parent, even if the nonparent did so in a shared custody, coparenting situation); *C.E.W. v. D.E.W.*, 2004 ME 43, 845 A.2d 1146 (affirming the trial court's award of parental rights to the biological mother's former same-sex partner, where the mother conceded that the partner was the child's *de facto* parent under Maine's common law, and rejecting the mother's argument that under relevant Maine statutory provisions a *de facto* parent's rights are limited to visitation only); *Latham v. Schwerdtfeger*, 802 N.W.2d 66 (Neb. 2011) (despite lack of statutory standing, biological mother's former same-sex partner had standing to seek custody and visitation under the doctrine of *in loco parentis*, which was well established in Nebraska's common law); *Clifford K. v. Paul S.*, 619 S.E.2d 138 (W. Va. 2005) (following the biological mother's death, her same-sex partner was awarded custody as the psychological parent, over the maternal grandfather, under the "exceptional cases" provision of a West Virginia statute). But *cf. In re Custody of H.S.H.-K.*, 533 N.W.2d 419 (Wis. 1995) (holding that biological mother's former same-sex partner lacked standing to seek custody, because she had not demonstrated the mother's unfitness or compelling circumstances requiring a custody change, but holding that, based on the courts' long-recognized equitable power, nonparent could establish standing to seek visitation if she demonstrated a parent-like relationship with the child and a significant triggering event justifying state intervention).

¶ 50       In his original briefs, in addition to his equitable parent argument, Jim also maintained that the common-law doctrine of *parens patriae* allows him to pursue custody and visitation. Jim argued that under this doctrine courts have inherent authority to exercise jurisdiction over children, independent of statute. The doctrine of *parens patriae* recognizes the "general power and obligation of the government as a whole to protect minors and the infirm." (Internal quotation marks omitted.) *In re D.S.*, 198 Ill. 2d 309, 328 (2001). The power was expressly incorporated into section 601(a) of the Dissolution Act (750 ILCS 5/601(a) (West 2012)). *Milenkovic v. Milenkovic*, 93 Ill. App. 3d 204, 213 (1981). However, "[t]his common law concept has traditionally empowered the courts, in extreme circumstances, to guard the welfare of neglected minors, incompetents, and others who suffer certain legal disabilities." *Milenkovic*, 93 Ill. App. 3d at 213. Given that Jim has not even alleged that Scarlett is subject to neglect or abuse, he has provided no basis upon which the trial court could exercise its *parens patriae* power. *Milenkovic*, 93 Ill. App. 3d at 213 n.8 (noting that the power is "considered extraordinary and is not intended as the basis of jurisdiction for general custody disputes between parents and others"). The cases cited by Jim do not convince us otherwise.

See, *e.g.*, *People ex rel. Lehman v. Lehman*, 34 Ill. 2d 286, 287 (1966) (addressing proper venue as between two different counties); *People ex rel. Vallera v. Rivera*, 39 Ill. App. 3d 775, 777 (1976) (reversing the trial court's denial of the putative father's visitation petition (pending the mother's paternity suit where the father admitted paternity) and remanding for a hearing on best interests of the child).

¶ 51                                   4. Further Analysis Upon Remand:
Standing Under Equitable Adoption Doctrine

¶ 52      We now turn to *DeHart*, in which our supreme court considered, *inter alia*, whether to recognize the theory of equitable adoption as a basis upon which the plaintiff could contest a will. In *DeHart*, the plaintiff argued that, because the decedent had equitably adopted him, the decedent's estate was estopped from denying the plaintiff's status as an heir at law. *DeHart*, 2013 IL 114137, ¶ 12.

¶ 53      For over 50 years, from the time the plaintiff was about two years old, the decedent had held out the plaintiff as his biological son to the plaintiff and to the world at large. The decedent married the plaintiff's biological mother after she had become pregnant out of wedlock. *DeHart*, 2013 IL 114137, ¶ 5. The decedent gave the plaintiff a birth certificate indicating that the decedent was the plaintiff's father. Both the decedent and the plaintiff used the birth certificate to conduct their affairs, to enroll the plaintiff in school, and to prove that the decedent was the plaintiff's natural father. *DeHart*, 2013 IL 114137, ¶ 3. When the plaintiff was about 56 years old, he acquired a certified copy of his birth certificate, which revealed that the decedent was not his biological father. *DeHart*, 2013 IL 114137, ¶ 4. When the plaintiff asked the decedent for an explanation,[7] the decedent told him that he had married the plaintiff's mother and adopted the plaintiff when he was two years old. The decedent explained that he had agreed with the plaintiff's mother to keep the adoption secret because the plaintiff had been born out of wedlock. The decedent told the plaintiff that he had hired a lawyer so that the adoption was legal. *DeHart*, 2013 IL 114137, ¶ 5. (Despite the decedent's assurances to the plaintiff, the record contained no legal documentation of an adoption. *DeHart*, 2013 IL 114137, ¶ 6.) Even after the certified birth certificate came to light and the plaintiff's mother died, the decedent continued to represent the plaintiff as his son and executed a will that provided for the plaintiff, as his son, as well as for the plaintiff's children. *DeHart*, 2013 IL 114137, ¶ 7.

¶ 54      When the decedent was 83 years old, he met and married the defendant, who was almost 30 years his junior. *DeHart*, 2013 IL 114137, ¶ 8. About one year later, the decedent signed a will, in which he stated that he had no children and bequeathed nothing to the plaintiff. *DeHart*, 2013 IL 114137, ¶ 9. When the decedent died a few months later, the defendant filed the latest will in the trial court. The plaintiff contested the will in a six-count complaint, alleging a lack of testamentary capacity, undue influence, fraudulent inducement, tortious interference with economic expectancy, contract for adoption, and equitable adoption. *DeHart*, 2013 IL 114137, ¶ 12. The trial court dismissed the plaintiff's entire complaint for failure to state a cause of action. *DeHart*, 2013 IL 114137, ¶ 13. The appellate court reversed, and the supreme court affirmed the appellate court. *DeHart*, 2013 IL 114137, ¶¶ 14, 77.

----

[7]At the time, the plaintiff's mother was suffering from early onset dementia. *DeHart*, 2013 IL 114137, ¶ 6.

¶ 55     Relevant to our discussion, the supreme court affirmed the appellate court's conclusion that the plaintiff had stated a claim under a theory of equitable adoption, but it rejected the appellate court's reasoning requiring proof of a contract to adopt. *DeHart*, 2013 IL 114137, ¶ 66. The supreme court pointed out that the concept of equitable adoption had been neither expressly recognized nor expressly rejected in Illinois. *DeHart*, 2013 IL 114137, ¶ 56. The court observed that many states equate the concept of equitable adoption with a contract-to-adopt theory. *DeHart*, 2013 IL 114137, ¶ 52. However, the court noted that a few states had refused to apply a steadfast requirement of a contract to adopt as a prerequisite to finding an equitable adoption. *DeHart*, 2013 IL 114137, ¶ 53. The court found that "the underpinnings to pave the way" for recognition of the concept of equitable adoption in Illinois existed in its contract-to-adopt decisions in *Monahan v. Monahan*, 14 Ill. 2d 449 (1958) (reversing the trial court's dismissal of the plaintiff's claim against the heirs of the decedent's estate because there was clear and convincing evidence of a contract to adopt), and *Weiss v. Beck*, 1 Ill. 2d 420 (1953) (affirming the trial court's dismissal of the plaintiff's claim against the heirs of the decedent's estate, because the evidence of an oral contract to adopt was not clear and convincing). *DeHart*, 2013 IL 114137, ¶ 56. The court discussed at length *Roberts v. Roberts*, 223 F. 775 (8th Cir. 1915) (allowing a claim against the decedent's estate based on an oral agreement to adopt), which the courts in both *Monahan* and *Weiss* cited with approval for the proposition that a contract to adopt can be shown by circumstantial evidence. *DeHart*, 2013 IL 114137, ¶¶ 57-58. The court observed that the decision in *Roberts* rested "more on equitable principles of fairness and intent rather than the ordinary rules of contract law." *DeHart*, 2013 IL 114137, ¶ 58. The court concluded that "*Roberts* supports the position that in Illinois an equitable adoption theory should be recognized under the right circumstances even in the absence of a statutory adoption or a contract for adoption." *DeHart*, 2013 IL 114137, ¶ 58.

¶ 56     The supreme court then addressed the question of what the right circumstances would be–meaning, absent a statutory adoption or a contract to adopt, what did the plaintiff need to prove to establish an equitable adoption. The court adopted the holding of the California Supreme Court in *In re Estate of Ford*, 82 P.3d 747 (Cal. 2004), because it "struck the proper balance" (*DeHart*, 2013 IL 114137, ¶ 59)–in not requiring proof of a contract to adopt, but also in not finding an equitable adoption based merely on a close familial relationship (*DeHart*, 2013 IL 114137, ¶ 54). The court held that an equitable adoption would be recognized in Illinois "only in those cases where there is sufficient, objective evidence of an intent to adopt (or fraudulently or mistakenly holding out as a natural child on a continual basis), supported by a close enduring familial relationship." *DeHart*, 2013 IL 114137, ¶ 62.

¶ 57     The court then turned to the quantum of evidence necessary to prove an equitable adoption claim. *DeHart*, 2013 IL 114137, ¶ 63. The court noted that, in the context of contract-to-adopt claims, clear and convincing evidence was required. *DeHart*, 2013 IL 114137, ¶ 63. The court reasoned that the same standard of proof should apply to equitable adoption claims. "When the lips of a deceased person who is alleged to have intended an adoption are sealed by death, proof of the facts necessary to invoke principles of equity should be clear, unequivocal and convincing." *DeHart*, 2013 IL 114137, ¶ 64. Additionally, citing *Ford*, the court expressed concern that "too lax a standard *** could create a danger that a person could not take in a child in need without having a *de facto* adoption perpetrated upon him after his death." *DeHart*, 2013 IL 114137, ¶ 64. Thus, the court held that clear and

convincing evidence was necessary to support an equitable adoption claim. The court elaborated that the decedent's intent "must not be just as readily harmonizable with the mere intention to provide a good home, but must instead indicate a clear intent to adopt or to continuously represent to the plaintiff and the world at large that the plaintiff was the decedent's natural child." *DeHart*, 2013 IL 114137, ¶ 65.

¶ 58    In reaching its holding, the court rejected the defendant's argument that allowing an equitable adoption claim to proceed without proof of a contract to adopt would result in unintended consequences where a person who was kind to a child but took no affirmative action to become a parent might nonetheless "be deemed to confer legal rights to that person as an heir." *DeHart*, 2013 IL 114137, ¶ 61. The court observed, "The narrow nature of our holding forecloses claims against the estate of *any* foster parent or stepparent who merely treats a foster or stepchild lovingly and on an equal basis with his or her natural or legally adopted children." (Emphasis in original.) *DeHart*, 2013 IL 114137, ¶ 62.

¶ 59    Before we turn to our supreme court's directive to reconsider our decision in light of *DeHart*, we pause to observe that our supreme court's recognition of the equitable adoption doctrine in *DeHart* is consistent with most other jurisdictions applying the doctrine in the estate context.[8] The doctrine is applied in that context "to give effect to the intent of the decedent to adopt and provide for the child." 2 Am. Jur. 2d *Adoption* § 63 (2013). Essentially, the equitable adoption doctrine allows the plaintiff to assert a property right. See *Ford*, 82 P.3d at 753 (describing the intent to be ascertained as that regarding "the decedent's likely intent regarding distribution of property"). In the estate context, the doctrine is "not intended or applied to create the legal relationship of parent and child, nor is it meant to create a legal adoption." 2 Am Jur. 2d *Adoption* § 63 (2013); Elizabeth A. Gaudio, *Family Law: Limiting the Scope of Equitable Adoption*, 54 Md. L. Rev. 822, 827 (1995) (stating that equitable adoption does not change the child's status to that of being legally adopted); see generally Tracy Bateman Farrell, 122 A.L.R.5th 205 (2004) (discussing various views on the implications of equitable adoption such as whether an equitably adopted child may be treated as legally adopted for inheritance tax purposes, life insurance benefits, wrongful death actions, social security benefits, etc.). Rather, "[t]he child shares in the estate of the deceased foster parent *as though* his own child but not as such." (Emphasis in original.) *Ford*, 82 P.3d at 751 (citing *In re Estate of Radovich*, 308 P.2d 14, 24 (Cal. 1957) (Schauer, J., dissenting, joined by McComb, J.), and noting that "Justice Schauer's explanation of the doctrine has been widely cited and relied upon ***."). "To correct the injustice that would result were the intestacy [or probate] laws woodenly applied, most jurisdictions grant equitable relief, when appropriate, to the extent of permitting [the child] to take the child's share he would have inherited [or recognizing his standing to challenge the decedent's will] had the foster parent legally adopted him." Jan Ellen Rein, *Relatives by Blood, Adoption, and Association: Who Should Get What and Why (The Impact of Adoptions, Adult Adoptions, and Equitable Adoptions on Intestate Succession and Class Gifts)*, 37 Vand. L. Rev. 711, 767 (1984).

¶ 60    In contrast to the limited implications of the equitable adoption doctrine in the estate context, the doctrine would have much broader consequences in the custody context. In the estate context, no ongoing relationship is created; instead, the court examines the relationship

---

[8]We refer below to the cases relied upon by Jim in which courts in other jurisdictions applied the equitable adoption doctrine in the context of child custody, visitation, and support.

between the decedent and the child–after the fact–as evidence of the decedent's intent to adopt. In the custody context, however, if an equitable adoption were recognized, an ongoing legal relationship between the child and the third party would result–with all of the potential, and perhaps unintended, legal consequences flowing therefrom.

¶ 61    With this framework in mind, we consider whether *DeHart*, with its unique facts and narrow holding, warrants a different result in the present case. In his petition, Jim's claims for custody and visitation (count I) and for child support (count II) were based on an equitable parent theory. The trial court observed that it was "bound to follow the law as it exists." As we discussed above, given that Illinois has never recognized the equitable parent doctrine (*T.P.S.*, 2012 IL App (5th) 120176, ¶ 64), the trial court properly found that Jim lacked standing under that theory. Nor did *DeHart* recognize or address the equitable parent theory.

¶ 62    Following our supreme court's supervisory order, in his briefs on reconsideration, Jim asks us to apply the equitable adoption doctrine announced in *DeHart*. He urges that giving effect to the equitable principles of fairness and intent is more important in the context of child custody than in the estate context, because "a child's emotional and financial well-being are at stake." Jim argues that the trial court's findings were sufficient for us to conclude that, under *DeHart*, he equitably adopted Scarlett. In the alternative, he asks that we "remand for further proceedings so that the circuit court can make factual findings as to whether Jim equitably adopted Scarlett in light of [*DeHart*]."

¶ 63    After the parties filed their briefs on reconsideration, the First District Appellate Court completed its reconsideration of its decision in *Mancine* in light of *DeHart*. *In re Marriage of Mancine*, 2014 IL App (1st) 111138-B. In its original opinion, the First District affirmed the trial court's section 2-619 dismissal of the husband's custody claim, based, *inter alia*, on an equitable adoption theory. The court held that the husband lacked standing because he was not the child's biological or legally adoptive parent. *Mancine*, 2012 IL App (1st) 111138-B, ¶ 1. On reconsideration, the court rejected application of the equitable adoption doctrine to the custody context. *Mancine*, 2014 IL App (1st) 111138-B, ¶ 2. The court held that *DeHart* did not warrant a different result, "because equitable adoption is a concept in probate to determine inheritance and should have no application in the context of statutory proceedings of adoption, divorce proceedings, or parentage, and also because the facts of this case are vastly different from *DeHart* and do not meet the adopted standards in *DeHart* to establish an equitable adoption." *Mancine*, 2014 IL App (1st) 111138-B, ¶ 2.

¶ 64    As should be clear from our foregoing discussion regarding the implications of applying the equitable adoption doctrine in the custody context, we appreciate the concerns raised by the court in *Mancine*. See *Mancine*, 2014 IL App (1st) 111138-B, ¶¶ 22-24. However, we are not prepared to hold, as a matter of law, that the equitable adoption doctrine could never be applied to a custody case. Thus, we decline to follow *Mancine*'s holding, because we believe that *DeHart* might present a potentially viable theory of standing for Jim.

¶ 65    Nonetheless, any determination regarding the applicability of the equitable adoption doctrine to the present case at this time would be premature given the current state of the record, which is not developed with respect to this theory. We acknowledge that the court in *Mancine* distinguished the facts of its case from those in *DeHart* and held that the facts before it did not satisfy the two elements of equitable adoption as set out in *DeHart*. Suffice it to say that, unlike in the present case, the custody claim in *Mancine* arose in the context of

divorce proceedings where the husband, the child's stepfather, argued that he had equitably adopted the child. In light of the subtleties presented by child custody cases and the *sui generis* nature of cases involving parental rights generally (see *In re A.D.R.*, 186 Ill. App. 3d 386, 390 (1989)), we find little guidance for this case in *Mancine*'s comparison of its facts with the facts in *DeHart*.

¶ 66 Here, the trial court heard 17 days of testimony and made extensive factual findings within the context of the pleadings before it. The court found that Jim and Maria planned and participated in the Slovakian adoption together and that Jim paid for it all and supported Maria during the process. The court found that Jim never adopted Scarlett but that the parties had "discussed" it. The court stated, "The reasons for these inactions are basically unknown except for the 'falling out' Jim and Maria had some time later." Jim points out the following passage from our previous opinion:

> "Jim testified that it was the parties' intent that both of them would pursue adoption of Scarlett in this country. He said that he had initiated discussions with Maria about adoption every three to six months through 2006. Jim testified that Maria's response was always positive but that she did not act upon his requests. He testified that, when he told Maria that he had found an attorney to handle the adoption, Maria responded that she was busy and that she wanted a Slovakian attorney." *Scarlett Z.-D.*, 2012 IL App (2d) 120266, ¶ 41, *appeal denied and judgment vacated by In re Parentage of Scarlett Z.-D.*, No. 115000 (Ill. May 29, 2013).

The trial court also found that "for a long time during and after the adoption of [Scarlett], Jim and Maria lived together with the child as an intact family unit as if they were bound legally." The court found that, for four years or more, Scarlett lived with Jim, called him "daddy," and looked to him as a "father figure."

¶ 67 Jim contends that these findings establish that the requirements of an equitable adoption as announced in *DeHart* have been met. The court in *DeHart* explained the limited nature of its holding, stating that "only in those cases where there is sufficient, objective evidence of an intent to adopt (or fraudulently or mistakenly holding out as a natural child on a continual basis), supported by a close enduring familial relationship, will an equitable adoption be recognized." *DeHart*, 2013 IL 114137, ¶ 62. The court in *DeHart* announced a narrow holding based on its unique facts–the decedent and the biological mother were married and, for several decades, effectuated their shared intent to deceive the plaintiff and the world at large that the plaintiff was their biological son (and later that the decedent had adopted the plaintiff). Thus, in the present case, we decline to simply extrapolate the trial court's findings into a determination of equitable adoption. A trial court does not make factual findings in a vacuum. A trial court makes its factual findings in the context of the pleadings, the evidence, and the parties' arguments. Prior to *DeHart*, and absent any argument from the parties, the trial court did not have the opportunity to evaluate the evidence with equitable adoption in mind. In order to give the trial court that opportunity, we vacate the trial court's order denying counts I and II and remand the case to the trial court with the following directions.

¶ 68 On remand, the court shall make factual findings with reference to the equitable adoption doctrine recognized in *DeHart*. In its discretion, the court may proceed solely on the evidence and arguments previously introduced, or hear additional arguments, or allow both new evidence and arguments. The court should consider, *inter alia*, whether there is "objective evidence" (*DeHart*, 2013 IL 114137, ¶ 62) that establishes the requisite "equitable

- 20 -

justification for finding an equitable adoption" (*DeHart*, 2013 IL 114137, ¶ 60) that existed in *DeHart*. As explained by the court in *Ford*, on which our supreme court relied heavily in *DeHart*, "[a]s the claim's strength lies in inherent justice [citation], the need in justice for this extraordinary equitable intervention [citation] should appear clearly and unequivocally from the facts." (Internal quotation marks omitted.) *Ford*, 82 P.3d at 754-55. Furthermore, the trial court should be cognizant of the caution from the court in *Ford* that "a rule looking to the parties' overall relationship in order to do equity in a given case, rather than to particular expressions of intent to adopt, would necessarily be a vague and subjective one, inconsistently applied, in an area of law where 'consistent, bright-line rules' [citation] are greatly needed." *Ford*, 82 P.3d at 753.

¶ 69     We note that, in support of his position, Jim relies on several out-of-state cases (*Johnson v. Johnson*, 2000 ND 170, 617 N.W.2d 97, *Geramifar v. Geramifar*, 688 A.2d 475 (Md. Ct. Spec. App. 1997), *Frye v. Frye*, 738 P.2d 505 (Nev. 1987) (*per curiam*), and *Atkinson v. Atkinson*, 408 N.W.2d 516 (Mich. Ct. App. 1987)), in which the courts applied the equitable adoption doctrine outside of the estate context. Again, cases from our sister states are not binding on this court. See *Grafner*, 393 Ill. App. 3d at 801. In any event, we briefly note that these cases are distinguishable. In *Johnson*, *Geramifar*, and *Frye*, unlike in the present case, child support claims were brought in divorce proceedings between spouses who had entered contracts to adopt (*Johnson*, 2000 ND 170, ¶ 22, 617 N.W.2d 97, 104-05; *Geramifar*, 688 A.2d at 478; *Frye*, 738 P.2d at 505). In *Atkinson*, the court recognized a nonparent's claims for parental rights against the biological mother, but the parties were married, and indeed the mother allowed the husband to think that he was the child's biological father until divorce proceedings were commenced, when the child was almost four years old. *Atkinson*, 408 N.W.2d at 517.

¶ 70                              5. Jim's Constitutional Arguments

¶ 71     Jim further contends that the trial court's denial of his petition violates both his and Scarlett's federal and state constitutional rights. Specifically, Jim urges that his and Scarlett's substantive due process rights to "familial association and integrity" were violated and that Scarlett's right to equal protection was violated because she was penalized "because of her birth status or her parents' marital status, which are beyond her control."

¶ 72     To the extent that Jim raises constitutional claims on Scarlett's behalf, we must reject them. The caption on Jim's petition states, "Scarlett [Z.-D.], A Minor Child, by James R.[D.], individually, and as next friend on behalf of minor child Scarlett [Z.-D.], Petitioners." We note that a minor may not bring a suit in her own name. *Severs v. Country Mutual Insurance Co.*, 89 Ill. 2d 515, 520 (1982); *Klak v. Skellion*, 317 Ill. App. 3d 1092, 1094-95 (2000). Although Jim filed a motion to be appointed next friend, the trial court denied it based on Jim's status as a party, which created a conflict of interest. Furthermore, "a party has standing to bring a constitutional challenge only if the party is able to show himself to be within the class aggrieved by the alleged unconstitutionality." *In re Marriage of Nienhouse*, 355 Ill. App. 3d 146, 153 (2004). Thus, Jim may not assert Scarlett's constitutional rights.

¶ 73     Regarding Jim's argument about his due process rights as a parent, we hold that the argument is premature; prior to remand, any review by this court of Jim's rights as a parent would be purely advisory.

## B. Counts III Through VI: Contract Claims

¶ 75      Jim finally urges that the dismissal of counts III through VI (breach of oral agreement, promissory estoppel, breach of implied contract in fact, and breach of implied contract in law, respectively) was erroneous, because the claims were properly pleaded and not contingent on a statute or a finding of parentage. Our review of a trial court's section 2-615 dismissal is *de novo*. *Rajterowski v. City of Sycamore*, 405 Ill. App. 3d 1086, 1092 (2010).

¶ 76      We hold that the trial court's dismissal of these counts was proper. Notwithstanding Jim's assertion to the contrary, we note that, based on our discussion above, *M.J.* and *T.P.S.* have no bearing on these claims, as those courts' holdings were expressly limited to cases involving children born by artificial insemination. See *T.P.S.*, 2012 IL App (5th) 120176, ¶¶ 53-54 (distinguishing our prior decision in this case on the basis that it did not involve artificial insemination). Although counts III through VI all sounded in contract, the relief sought was custody, visitation, and child support determinations. See *Wabash County v. Illinois Municipal Retirement Fund*, 408 Ill. App. 3d 924, 932 (2011) (stating that the substance of a pleading is controlling, not its title). Thus, to recognize Jim's contract claims as valid would allow him to circumvent the statutory standing requirements. Absent a legal or equitable basis to do so, such circumvention would be improper. Furthermore, if it is ultimately determined that Jim does have standing, the claims raised in counts III through VI will be effectively moot. Accordingly, we affirm the trial court's dismissal of these claims. See *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 300 (2005) (we can affirm dismissal on any basis supported by record, regardless of trial court's reasoning).

## III. CONCLUSION

¶ 78      In sum, the trial court correctly determined that Maria did not waive the issue of standing, and its conclusion that equitable estoppel did not apply was not against the manifest weight of the evidence. Regarding standing, as Jim concedes, he is not Scarlett's biological or legally adoptive parent, and Scarlett has always been in Maria's physical custody. Therefore, under the Dissolution Act and the Parentage Act of 1984, Jim had no standing to bring his claims for custody, visitation, and support. Furthermore, because Illinois does not recognize the equitable parent doctrine, Jim is precluded from asserting standing on that theory. However, because the equitable adoption doctrine announced in *DeHart* might present a potentially viable theory upon which Jim could assert standing, we remand for further proceedings. On remand, the trial court should make additional factual findings, pursuant to the equitable adoption doctrine, to determine whether there is a "need in justice for this extraordinary equitable intervention." (Internal quotation marks omitted.) *Ford*, 82 P.3d at 754-55. In its discretion, the court may, but need not, hear additional evidence or argument, or both, on the issue of equitable adoption. If the court finds that Jim does have standing under the equitable adoption theory, the court should proceed to consider Scarlett's best interests. If the court finds that Jim does not have standing, it should deny counts I and II again. Finally, we affirm the court's section 2-615 dismissal of counts III through VI.

¶ 79      For all of the foregoing reasons, the trial court's dismissal of counts III through VI is affirmed. We vacate the trial court's February 29, 2012, order denying counts I and II. We remand the cause to the circuit court of Du Page County for further proceedings on counts I and II.

¶ 80        Affirmed in part and vacated in part; cause remanded with directions.

¶ 81        JUSTICE McLAREN, specially concurring in part and dissenting in part.

¶ 82        I specially concur in the portion of the opinion that remands the case to the trial court for further findings and reconsideration. I dissent from the limited scope of the proceedings that the majority orders on remand, as well as from the limitations that the majority imposes upon the trial court's ability to render findings of fact and conclusions of law based upon the opinion in *DeHart*.

¶ 83        I would vacate the trial court's entire judgment and remand the cause for further proceedings on all counts. I would direct the trial court to reconsider its rulings on the issue of standing as it applies to all counts. *DeHart* considered two aspects of adoption law. One aspect related to the contractual concept of *contract to adopt*; the other aspect was the equitable concept of *equitable adoption*. I do not believe that the pleadings in this case relate to a contract to adopt. On the other hand, I do believe that the equitable concept of equitable adoption has relevance to Jim's standing to seek the requested relief. The trial court should determine if Jim has standing as to any count under the equitable factors of estoppel *underlying the concept* of equitable adoption. If Jim is found to have standing, the trial court should determine whether the presentation of further evidence or argument is appropriate. Thereafter, it should rule on the merits of any count for which Jim has standing.

¶ 84        I also disagree with the majority's apparent adoption of the "clear and convincing evidence" burden of proof on remand. See *supra* ¶ 57. "When the lips of a deceased person who is alleged to have intended an adoption are sealed by death, proof of the facts necessary to invoke principles of equity should be clear, unequivocal and convincing." *DeHart*, 2013 IL 114137, ¶ 64. Unlike the "father" in *DeHart*, Maria is not deceased and can testify regarding the merits of the case. Neither the Dead-Man's Act (735 ILCS 5/8-201 (West 2010)) nor the rationale for raising the burden of proof due to the death or incapacity of a party is applicable here. I believe that the proper burden of proof is proof by a preponderance of the evidence, a not insubstantial burden that is the same, incidentally, as that necessary to find that it is in a child's best interests that his parent's parental rights be terminated. See *In re D.T.*, 212 Ill. 2d 347, 364-66 (2004).

¶ 85        I agree with the majority that the cause should be remanded. The trial court did not make sufficient findings of fact because it dismissed the cause on the basis of a lack of standing. As the majority indicated, Maria raised the issue of standing in her motions to dismiss brought under both section 2-615 and section 2-619 of the Code. When the trial court dismissed counts III through VI, it did so for reasons that of necessity were affected by *DeHart*, because the "linchpin" of standing permeated Maria's motions to dismiss. See *supra* ¶ 24. The trial court commented on the evidence, but its ultimate judgment was that Jim lacked standing. That being the case, there are no findings of fact or conclusions of law in the record that we may consider or reconsider. See *In re T.P.S.*, 2011 IL App (5th) 100617, ¶ 10, in which the appellate court reversed the trial court and remanded the cause without addressing the merits, because the trial court's decision was based only on the respondent's lack of standing:

              "The only issue in this appeal is whether Cathy has standing to oppose Dee's petitions to terminate the guardianships. We note that both parties raise additional issues; however, because the court determined that Cathy lacked standing, it did not

- 23 -

consider other issues. Thus, those issues are not before us. See *People v. Nelson*, 377 Ill. App. 3d 1031, 1040-41 *** (2007) (explaining that appellate courts should not consider issues not yet addressed by the trial court because to do so would mean rendering an advisory opinion)."

¶ 86　However, the majority is speculating as to what the trial court might have done had it known that equitable estoppel might be available to give standing to Jim, or, more correctly, to estop Maria from raising a lack of standing. The trial court is not prescient and could not have known how to conduct the hearings and the trial, apply the law that now exists to the evidence, and make findings of fact and conclusions of law. The trial court should be given a clean slate and apply the law that presently exists or may exist in the future through extrapolation.

¶ 87　Historically, standing was defined as "some injury in fact to a legally cognizable interest." *Glisson v. City of Marion*, 188 Ill. 2d 211, 221 (1999). "The claimed injury may be actual or threatened, and it must be (1) distinct and palpable; (2) fairly traceable to the defendant's actions; and (3) substantially likely to be prevented or redressed by the grant of the requested relief." *Id.* The doctrine of standing is designed to preclude persons who have no interest in a controversy from bringing suit. *Id.* The doctrine ensures that issues are raised only by those parties with a real interest in the outcome of the controversy. *Id.* Additionally, standing was an affirmative matter that could be forfeited. See *Lyons v. Ryan*, 324 Ill. App. 3d 1094, 1102 (2001*), aff'd*, 201 Ill. 2d 529 (2002) ("Nevertheless, the ruling in [*Contract Development Corp. v.*] *Beck*, [255 Ill. App. 3d 660, 664 (1994)] (and similar cases) that standing can be waived is correct.").

¶ 88　I submit that, under the classic definition of standing, Jim would be allowed to seek relief. However, in parent/child relationships, standing has been altered and codified allegedly in order to protect a parent's constitutional right to raise his or her child unhampered by intrusions by the State or third parties. In *Troxel*, "the Court reiterated that a parent's right to control the upbringing of his or her children is a fundamental constitutional right." *In re R.C.*, 195 Ill. 2d 291, 303 (2001). "The standing requirement of section 601(b)(2) of the [Dissolution] Act is designed to 'ensure[ ] that the superior right of natural parents to the care and custody of their children is safeguarded.' [Citation.]" *In re A.W.J.*, 197 Ill. 2d 492, 497 (2001). The standing requirements in section 601(b)(2) of the Dissolution Act, section 11-5(b) of the Probate Act, and section 7 of the Parentage Act of 1984 are instances of the creation of statutory standing. See, *e.g.*, *id.* at 496 ("[A] nonparent's 'standing' under section 601(b)(2) does not refer to whether a litigant has a justiciable interest in a controversy [citation].") "[W]hen used in this sense, 'standing' simply referred to a threshold statutory requirement that had to be met before the court could proceed to a decision on the merits [citation]." *In re R.L.S.*, 218 Ill. 2d 428, 436 (2006).

¶ 89　Although a party may have a constitutional right under the law, it has historically been subject to equitable relief. For example, a party's constitutional claim may be considered waived pursuant to the equitable doctrine of *laches*. See *Levitt v. Hammonds*, 256 Ill. App. 3d 62, 67 (1993). Equity may have been repressed by the passage of legislation regarding standing, but the fundamental principle of equity ought not be disregarded when the law, as applied, is inequitable.

¶ 90　Equitable estoppel, which may alter the common law and the strictures of the Probate Act under appropriate circumstances, is also available to estop a parent from arguing a lack of

statutory standing, per my reading of *DeHart*. Equity or chancery court in England developed as a means to obtain relief when the King's seven common-law writs were inapplicable, unavailable, or worse; "[b]ills in equity were written to persuade the Chancellor to relieve the petitioner from an alleged injustice that would result from rigorous application of the common law" and "became the procedural vehicle for the exceptional case." Stephen S. Subrin, *How Equity Conquered Common Law: The Federal Rules of Civil Procedure in Historical Perspective*, 135 U. Pa. L. Rev. 909, 918 (1987). " 'Chancery's flexible concern for justice complemented admirably the formalism of a medieval system of common law which had begun to adhere strictly, perhaps overstrictly on occasion, to prescribed forms.' " Black's Law Dictionary 225 (7th ed. 1999) (quoting A.H. Manchester, A Modern Legal History of England and Wales, 1750-1950, at 135-36 (1980)). Ironically, the chancery court was the court that held jurisdiction over infants: " 'The Court of Chancery is by law the guardian of infants whom it makes its wards.' " *In re Estate of Reighard*, 402 Ill. 364, 377 (1949) (Crampton, J., dissenting) (quoting Lord Justice James in *Beall v. Smith*, (1873) L.R. 9 Ch. Ap. 85, 92).

¶ 91 Section 12 of article I of the Illinois Constitution of 1970 embodies the equitable maxim that "equity will not suffer a wrong without a remedy." (Internal quotation marks omitted.) *Miller v. Moran*, 96 Ill. App. 3d 596, 599 (1981).[9] This maxim has roots in *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), which used the maxim to determine that Marbury ought to have a remedy for the wrong experienced:

> " '[A]ll possible injuries whatsoever [as are cognizable by the courts of the common law], that did not fall within the exclusive cognizance of either the ecclesiastical, military, or maritime tribunals, are for that very reason, within the cognizance of the common law courts of justice; for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.' " *Id.* at 163 (quoting 3 William Blackstone, Commentaries *109).

As *DeHart* established in granting relief despite statutory and common law to the contrary, the maxim still holds, and equity still will not suffer a wrong without a remedy.

¶ 92 A review of the cases involving parent/child and nonparent/child relationships over the last 20 years will persuade most that the present laws in this area are not keeping pace with the substantial changes in societal relationships. The special concurrence in *Mancine* suggests that the legislature consider new legislation, which is the most appropriate mechanism for improvement. See *Mancine*, 2014 IL App (1st) 111138-B, ¶¶ 81, 89 (Mason, J., specially concurring). Meanwhile, I submit that time is of the essence, as the courts deal with children whose development by the most nurturing relationships available is compromised by delay and inaction.

¶ 93 I am not suggesting that the trial court needs to adopt the equitable parent doctrine or any other denominated doctrine. I am suggesting that, if the "wrong" that Jim has suffered is sufficiently egregious, then the court has the inherent power to estop Maria from arguing standing, and certain facts required by statute need not be established by Jim. Further, the

---

[9]"Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly." Ill. Const. 1970, art. I, § 12.

classical form of standing, wherein the defendant was required to establish lack of a claimed injury, should apply.

¶ 94    As the majority noted, the supreme court concluded in *DeHart* that *Roberts* " 'supports the position that in Illinois an equitable adoption theory should be recognized under the right circumstances even in the absence of a statutory adoption or a contract for adoption.' [Citation.]" *Supra* ¶ 55. Why should equity not be applied here? It remains to be seen if the wrong is sufficiently egregious. And that should be the domain of the trial court.